UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PINNACLE MINDS, INC.,

Plaintiff,

-vs.-

CULAIN CAPITAL FUNDING LLC

Defendant.

Case No._________

**COMPLAINT**

Plaintiff Pinnacle Minds, Inc. ("PMI") by and through its counsel Blank Rome LLP, states as its action against Defendant Culain Capital Funding LLC ("Culain"), the following:

## PRELIMINARY STATEMENT

Culain is a predatory lender masquerading as a factoring firm. With specific regard to its business relationship with PMI, Culain presented itself as an honest invoice factor providing important cash flow relief for a small business like PMI, a company which, among other services, files Employee Retention Credit ("ERC") claims for its clients without charging upfront fees. PMI incurs all staffing and operating costs, awaiting IRS refund credits to its clients before invoicing, taking a percentage of the ERC refunds. PMI's funding need was purely timing-related – not due to customer or billing inefficiency, but because of PMI's client-first, no-upfront-fee model.

Culain exploited this model, engaging in a predatory lending scheme through a complex financial services instrument that Culain used to lure PMI into an invoice factoring relationship that was intended to be, and functioned as, a loan. After preying upon PMI for more than 1.5 years by construing the parties' April 20, 2023 Factoring Agreement (the "Agreement," Ex. A) as applying the relevant discount factor (interest rate) to the balance of customer invoice amounts

then due, Culain unilaterally changed its interpretation of the Agreement in a way – by withholding payments on all of the invoices Culain factors – that has pushed PMI to the edge of business extinction. Without the immediate injunctive relief sought in this lawsuit, PMI will fail as a company.

In addition, without an award of the damages sought in this lawsuit and a declaration that the Agreement is not construed in the PMI-revenue-deprived manner demanded by Culain, PMI may not be able to continue even after injunctive relief is granted. Without injunctive relief, PMI will suffer immediate and irreparable harm that threatens its ability to continue operations.

The harms in this lawsuit are caused by Culain intentionally misinterpreting a contract clause in a way that deprives PMI of factored and non-factored invoice payments, and the benefit of the bargain PMI relied upon when presented with the Agreement. Culain's illegitimate and narrow construction of the Agreement, especially how a discount rate is applied to open PMI customer invoices that have not been fully paid, threatens to destroy PMI's business. Culain not only has utilized a planned revisionist interpretation of the subject clause to deprive PMI of the payments for its factored invoices, but has engaged in unlawful and extra-contractual self-help to recover what it unilaterally claims is more than 1.5 years of overpayments to PMI. Rather than confront PMI about the alleged overpayments and seek a resolution, Culain, which captures all PMI customer invoice payments under the Agreement, diverted all payments due PMI to a reserve fund that it claims is authorized by the Agreement, including seizing invoices that were not factored – a fraud.

That is, Culain is converting every PMI invoice no matter whether the invoice has been "purchased" for factoring until Culain is satisfied that the amount it unilaterally determined was

overpaid, is fully collected. Not only is there no contractual authority to engage in such predatory conduct, but Culain is choking PMI into a business collapse.

Culain has implemented every factor non-payment trick in the predatory lender handbook, including seizing account invoices that were not factored, all in an attempt to collect additional fees based upon an intentionally dubious and bad faith construction of the Agreement, a scheme Culain planned from the outset of the contract. Indeed, when Culain was first introduced to PMI, which had never previously entered into a factoring relationship and, without the assistance of counsel, was not familiar with the factor-loan concept, Culain explained that the discount (interest) rate would be applied to reduced invoice amounts as customer payments were received, and construed and applied the Agreement accordingly from April 2023 inception through at least mid-October 2024. Culain sent weekly reports during this period confirming this intended calculation methodology, which PMI accepted, and reconciled its records. When Culain later unilaterally changed its calculation method, PMI objected, but it was too late, as Culain had already seized control over PMI's accounts receivable, and started diverting all invoice payments.

As Culain planned from inception, after PMI had become dependent upon the business relationship and Culain obtained control over PMI's accounts receivable, Culain changed its interpretation to increase the withheld percentages of PMI customer invoices. Culain seized factored and non-factored funds it had no contractual right to hold, all under the guise of "overpayment" recovery. Such intentional and fraudulent actions have irreparably harmed PMI, bringing it to near business failure. Absent the injunctive relief sought herein, PMI will not be able to continue as a going concern.

## THE PARTIES

1. PMI is a California company that maintains its principal place of business in Camarillo, California.

2. Culain is a Delaware company that was incorporated on May 9, 2022, and maintains its principal place of business in Buffalo, New York.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to (i) 28 U.S.C. § 1332, as it arises from a dispute between corporate citizens of different states, with an amount in controversy greater than $75,000, exclusive of interest and costs; and (ii) 28 U.S.C. § 2201.

4. Diversity of citizenship exists because Plaintiff is a citizen of California and Defendant is a citizen of New York. Upon information and belief, Culain does not have an LLC member who is a citizen of California.

5. This Court may exercise personal jurisdiction over Culain because it has (i) contractually submitted to the jurisdiction of the federal courts located in Erie County, New York; (ii) transacted business within New York out of which this dispute has arisen; and (iii) maintains minimum contacts with New York such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

6. Venue is proper in this District because (i) a substantial part of the events or omissions giving rise to PMI's claims arose from actions occurring in this District; (ii) Culain's contacts with this District are sufficient to subject it to personal jurisdiction if this District were a separate state; (iii) the parties contractually consented to venue in the state and federal courts in Erie County, New York for the adjudication of any dispute under the parties' contract or in

connection with any transaction contemplated by the parties' contract; and (iv) the Western District of New York is the District in New York with which Culain has had the most significant contacts.

7. In addition, pursuant to 28 U.S.C. § 1391, venue properly lies in this District because Defendant Culain is headquartered in this District.

8. This Court has the authority to hear causes of action seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202, which statute authorizes a party to seek further relief – whether it be damages, fees, or an injunction – following a court order of declaratory relief.

9. PMI is authorized to file a motion for further relief pursuant to 28 U.S.C. § 2202, following a declaratory judgment.

## FACTS COMMON TO ALL CLAIMS

10. PMI formed in 2005 to assist customers in simplifying the complex process of applying for valuable tax incentives, including consulting about tax credits and financial solutions primarily for small businesses.

11. PMI started as a one-person merchant services agency helping small businesses reduce credit card processing fees. After the COVID-19 pandemic, PMI expanded to assist its merchants and other small businesses with tax credit consulting, including the ERC.

12. PMI required capital because it filed ERC claims without charging upfront fees, covering all operating costs while waiting for the IRS to pay clients before invoicing. The funding need was purely timing-related, driven by PMI's no-upfront-fee, client-first model.

13. PMI employs nearly ten persons, including former IRS auditors and other professionals to navigate the complexities of complying with tax and similar laws pertaining to tax credits and merchant services.

14. When PMI assists customers to obtain tax and similar relief, it typically comes in the form of quarterly payments by the government, for instance, tax refunds paid over a period of time by the IRS. PMI contracts to receive a percentage of the tax credit payments received by its customers, then invoicing the customer for a payment.

15. Unlike other invoice factor programs, PMI's customers' invoices have little if any risk of non-payment – the government always pays. That fact is more than confirmed by Culain having secured credit insurance for invoices purchased under the Agreement, but Culain has not had to submit any insurance claims, as the IRS always pays.

16. Because the fee percentage payments owed to PMI occur over time, creating cash flow issues for its small business profile, PMI became introduced to Culain, which presented itself as an invoice factor able to advance money to its clients based upon taking a risk on payment of the invoice by its clients' customers. Collecting on PMI's invoices presented little if any risk to Culain because the U.S. government was obligated to render the tax credit refunds to the customer, and Culain was able to pick-and-choose which PMI invoices it desired to factor.

17. PMI wanted finance options for its business, comprised of, for purposes of this lawsuit, two forms of receivables: (i) fees and commissions due PMI in payment of the services it provides to taxpayers seeking an ERC payment from the IRS, which are the receivables subject to the Agreement; and (ii) receivables due the taxpayer from the IRS which are not subject to factoring. The commission payable to PMI is the receivable at issue.

18. PMI saw Culain as a potential factoring partner and lender. When courting PMI, Culain's Joseph A. Heim (Chief Credit Officer) and James Franz (President) explained to PMI's CEO Mike Anthony; CFO Darren Sardoff; and COO Joseph Kerolos on or about March 16, 2023, at PMI's offices in Camarillo, California, that PMI would receive an initial payment followed by

residual payments as the invoices were paid, primarily processed through calls and follow-up communications, and then operationally through the portal / spreadsheets used to track customer payment activity.

19. During the meeting in Camarillo, California, PMI explained to Culain's executives that ERC receivables carried incredibly low credit risk because the IRS was the paying party. Unlike typical factoring scenarios where a factor assumes meaningful risk that a debtor will not pay, Culain's risk of non-payment on PMI's invoices was effectively zero.

20. PMI also explained at the meeting that longer payment timelines on ERC receivables actually increased the likelihood of payment and the quality of the debtor, because extended processing time meant the IRS had spent more time reviewing and validating the customer's ERC claim before issuing payment. Therefore, delay in remitting the ERC payments was a signal of thoroughness, not of default risk, which is the opposite of traditional factoring, where delayed payment typically signals increased risk.

21. For this reason, PMI explained at the meeting that placing PMI in default for an elongated payment timeline would be contrary to the spirit of default provisions, which are designed to address situations of increased credit risk. With ERC receivables, the longer the IRS took to process a claim, the more certain payment became, rendering default provisions based on payment timing inapposite.

22. Given the unique structure of ERC payments – which the IRS remits on a quarterly basis and at irregular intervals regardless of the specific customer – PMI and Culain discussed the need to develop a methodology for splitting invoices across multiple quarters for each customer. This was a practical necessity arising from the ERC payment structure that did not exist in traditional factoring.

23. These meeting discussions were important because they established that Culain and PMI understood that the ERC factoring arrangement was fundamentally different from a standard factoring relationship, particularly with respect to credit risk, payment timing, and the inapplicability of traditional default and fee concepts.

24. Based upon the representations made by Culain's principals, PMI understood that the Variable Discount[1] (effective interest) would be applied to the declining balance of each factored invoice as it was paid down by PMI's customer. Indeed, as the IRS remitted quarterly ERC payments to PMI's customers and those payments were collected by Culain through Culain's designated account (known as a "Lockbox"), the amount upon which the Variable Discount was calculated would decrease proportionally.

25. At and after the meeting at PMI's office, Culain represented to PMI that the structure would work as follows: Culain advanced an "Initial Payment" (65% of the invoice amount) when PMI submitted invoices for funding that were purchased by Culain; as PMI's customers remitted payments into Culain's designated Lockbox account, Culain would accept those collections and then remit Residual Payments to PMI after deducting the applicable discounts / fees, which were effective interest.

26. Operationally, the Residual Payments calculation would be reflected in Culain's reporting software (the "FactorSoft" portal) and the spreadsheets Culain was to provide, which PMI would rely upon to understand how the amounts were being computed.

27. Satisfied with Culain's explanation of how the factoring process would work, particularly given Culain's representation that the discount tied to the Residual Payments would be applied to the reduced amount of the outstanding customer invoice as it was paid down based

[1] Proper nouns have the meaning attributed to them in the Agreement.

upon receipt of government tax credits, which is the common way factors apply the interest rate in this type of situation, PMI entered into the Agreement.

28. For more than 1.5 years of performance under the Agreement, Culain's reporting and spreadsheets reflected (as PMI understood under the Agreement and as promised by Culain before entering into the Agreement) that the fees and discounts were being applied in a manner consistent with the receivable being paid down over time, and that once payments were received, the ongoing Residual Payment would track the remaining unpaid balance rather than continuing as if the entire original invoice face amount remained outstanding.

29. PMI relied on Culain's reporting and spreadsheets as the practical description of how these Residual Payments were being calculated.

30. The manner by which the Residual Payments would be calculated and paid to PMI was of critical importance to PMI, particularly given that such stream of Residual Payments allowed PMI to stay in, and conduct its business.

31. It was the promises by Culain with regard to the Residual Payments, and PMI's understanding about how the interest would be applied based upon such representations, which caused PMI to agree to enter into the Agreement, as PMI desired and needed this form of loan facility in order to operate.

32. Relying on these promises and explanations, PMI agreed to enter into the loan agreement with Culain, understanding that the 'factored' receivables were part of a general financing and loan arrangement – which is how Culain treated the arrangement.

## A. The Factoring Agreement

33. The parties entered into the Agreement, which includes in its Recital that *"Seller [PMI] wishes to obtain financing by factoring, selling and assigning to Buyer [Culain] certain accounts receivable"* upon the terms of the Agreement.

34. The Agreement generally operates as follows: PMI conducts its business in the usual course, directing its customers in the invoice that payments due PMI are to be remitted to Culain, which, upon receipt of the invoice, decides whether to factor (purchase) such invoice. While the invoice remains open (the IRS generally remits ERC payments quarterly), PMI's customer remits directly to Culain a percentage of tax payments the customer collects from the government agency based upon the services rendered by PMI, typically the IRS. The customer does not remit the tax percentage recovery payments directly to PMI, but instead to Culain, which then remits to PMI its contractual share of such customer payments.

35. The process requires Culain to remit an initial payment to PMI based upon the total invoice amount, a loan to PMI pending collection of the invoice by Culain. Given that the IRS is the entity generally remitting payments to PMI's customers, there is almost no risk to Culain of non-payment.

36. Under the Agreement, PMI customer invoices are delivered to Culain (the "Eligible Receivables," Agreement definitions, Sections 2, 8.1(b)), which elects which invoices to purchase (the "Purchased Receivables," Section 2.4).

37. If Culain does not purchase an invoice, it is a non-factored invoice, but, still, the PMI customer is directed in the invoice to remit payment to Culain. That is, Culain receives all PMI customer payments no matter whether the Eligible Receivable is purchased by Culain,

transferring to Culain total control over every PMI customer invoice and payment, even the invoices that Culain elects not to purchase, historically during the Agreement approximately 33%.

38. For non-factored invoices, PMI is due the entire customer payment. For Purchased Receivables under the Agreement, PMI is due a payment, the Purchase Price (Section 4.1) for each purchased Eligible Receivable, comprising the (i) Initial Payment (whether the Gross Amount or Net Amount) multiplied by the Initial Payment Rate (Item 7: 65%); plus (ii) Residual Payment, calculated as the amount of Collections received by Culain and credited to Seller's account.

39. The Initial Payment is to be paid to PMI within 24 hours or five business days, depending on whether it is a Material Eligible Receivable (= / > $100,000).

40. The Residual Payment contemplates an amount which is reduced by the amount of the Initial Payment plus "the 'Fixed Discount' and the 'Variable Discount' [] applicable to such Purchased Receivable . . ." (Section 4.3).

41. The Fixed Discount is defined in Agreement Item 8 as 1.30% of the Gross Amount or Net Amount as applied to that Purchased Receivable.

42. The Variable Discount is defined in Item 10 as an amount equal to the Initial Payment multiplied by a daily defined percentage rate applied based upon the date of the Fixed Discount Period "continuing for each calendar day in which a Purchased Receivable remains unpaid, in whole or in part, and ending on the Payment Credit Date . . . in an aggregate amount equal to the . . . Initial Payment . . ." The Variable Discount is effective interest.

43. The interest rate is to be applied to the remaining (and, thereby, reduced) balance of any amount owed by the PMI customer under the Purchased Receivable; for example, when the Purchased Receivable is reduced by an IRS tax payment received by the customer and remitted to Culain through the Agreement Section 6 Lockbox under the PMI invoice, the amount due under

the Purchased Receivable is reduced, simultaneously reducing the amount to which the Variable Discount is applied.

44. The Variable Discount (that is, the interest rate) deduction is therefore applied to the remaining invoice balance, not the entirety of the original Purchased Receivable upon which the Initial Payment was based. This requirement is reflected in Agreement Section 4.3, which provides that the "Variable Discount will be charged to Seller's [PMI] account . . . until the related purchased Receivable is paid in full," confirming that the Variable Discount is applied to the open invoice until it is paid in full, not that the Variable Discount is applied to the face amount of the invoice until it is paid in full, which would be an incongruous result given that the Variable Discount is paid on the reduced amount of the invoice.

45. Culain understood this Variable Discount calculation basis from the inception of the Agreement through at least October 15, 2024, after which Culain changed its calculation (falsely blaming a software error that caused overpayments from Agreement inception), and thereby engaging in unlawful self-help of recovering such alleged overpayments by invoking the Reserve Account Residual Payment diversion scheme.

## B. <u>The Intentional and Material Breaches</u>

46. Pursuant to Agreement Section 4.1, PMI is entitled to be paid the Purchase Price with respect to each Purchased Receivable, which is a stand-alone Eligible Receivable that Culain elected to purchase under Agreement Section 2.1. Culain determines which of the Eligible Receivables it will purchase among all Receivables "arising out of a sale in the ordinary course of Seller's business" (Definitions Schedule).

47. Culain picks-and-chooses which Seller Receivable to factor as a loan to PMI, and which to reject. Each Eligible Receivable, when purchased by Culain, becomes under the

Agreement a Purchased Receivable, which then follows the Agreement's track for PMI to be paid when the customer remits payments under the invoice to Culain via Culain's Lockbox.

48. That is, the Eligible Receivable is converted into a Purchased Receivable when purchased by Culain, but the customer payments under the invoice are still due to PMI, routed through Culain, which factors the payment under the Agreement, remitting to PMI its share as governed by the Agreement.

49. From the beginning of the Agreement, Culain furnished emails to PMI when a customer payment was received by Culain pursuant to an invoice it purchased, including how much PMI could expect to receive for the factored invoice. Culain applied the same reporting for non-factored invoices, which are invoices that Culain elected not to purchase, for which full customer payments were due PMI.

50. Then, things changed. On October 1, 2024, Culain's Anita Hall informed PMI that PMI would not be receiving Residual Payments because of "the fees eating up any residual we would be sending you." On the same day, PMI's CFO replied that the subject Invoice 9140 indicated 420 fee days and a fee of $1,787.04 on a $4,020.75 payment, a 44.4% fee, but when applying the Agreement's contractual rates (0.0417% per day for 180 days, 0.05833% thereafter), the result was 21.48%, confirming Culain withheld more than double the contractual rate.

51. On October 2, 2024, Culain's Michael Franz replied: *"Joe and I are working through the calculation of fees. We believe we have discovered an application error in our portfolio management software [FactorSoft] where the application of partial payments is not consistent with the factoring agreement."*

52. Thus, it was PMI which first discovered Culain was miscalculating the Residual Payment fees, leading Culain to acknowledge that its software's "application of partial payments is not consistent with the factoring agreement."

53. When Culain acknowledged the FactorSoft errors, PMI took steps to avoid submitting new invoices to Culain for factoring, reasoning that if Culain informed PMI that its software had been calculating fees incorrectly and that the fee structure would change, PMI could not responsibly submit new invoices – effectively taking out new loans – without knowing the revised pricing. PMI could not commit to financing arrangements where the cost was unknown and subject to unilateral revision by Culain.

54. PMI's concern turned out to be prescient, because after being alerted to discrepancies on how the Residual Payments were being calculated, Culain, starting in or about November 2024, unilaterally changed its reporting, declining to make such information available to PMI and delaying wired payments due PMI from the factored and non-factored accounts.

55. Culain blamed the protocol change on its software portfolio management program, FactorSoft, which Culain's Mr. Heim claimed was not producing accurate information.

56. In truth, Culain was merely blaming FactorSoft as a cover, because Culain was instead refusing to honor the calculation methods prescribed by the Agreement when fixing the Residual Payments, adopting an extra-contractual interpretation that Culain claims authorized it to apply the Variable Discount used to compute the Residual Payment through the date the entire subject PMI customer invoice was paid on the full face amount of the invoice, rather than on the paid-down amount until the invoice was retired.

57. In fact, Culain changed the way it calculated the Residual Payments on or about October 15, 2024, a change Culain apparently attributed to PMI flagging on October 2 the Residual

Payment calculation errors. But in truth, Culain either plotted from the beginning of the Agreement to change the Residual Payments basis of calculation in order to secure more fees or used the opportunity first flagged by PMI to change its calculation approach contrary to the language of the Agreement, either set of intentional actions an act of fraud.

58. After changing its means of calculating the Residual Payments on or about October 15, 2024, Culain, starting in November 2024, changed its Residual Payments reporting to PMI, claiming that it had overpaid PMI on the Residual Payments, defined in Agreement Section 4.3, because FactorSoft was applying the Variable Discount formula (the interest rate) against the reduced customer invoice balance, rather than the entire invoice face amount through the date the invoice was fully paid.

59. Culain justified its change by claiming on or about November 12, 2024 that an audit revealed the overpayments, starting a chain of events that has led to this lawsuit. PMI notified Culain of this reporting change on or about December 10, 2024.

60. During this same period, specifically on or about November 6, 2024, Culain also asserted – without contractual basis – that it was entitled to fifty-percent (50%) of the IRS interest paid to PMI's clients on ERC refunds. After months of dispute, in or around mid-2025 (after Culain's purported external audit was completed), Culain refocused its position on the Variable Discount calculation.

61. As an example of how Culain was defrauding PMI, prior to Culain unilaterally changing its construction of the Agreement, if there was a $100,000 PMI customer invoice that was paid down $90,000 based upon the customer having received an ERC tax refund, Culain would apply the Variable Discount (interest rate) on the $10,000 balance, a calculation method Culain adopted under the Agreement from inception through approximately October 15, 2024. Thus, the

fraud commenced either at the inception of the Agreement or on or about October 15, 2024, when Culain discovered that it could advance an argument to apply the Variable Discount to the face amount of the invoices until paid in full.

62. The Residual Payment method of calculation applied to the reduced amount of the paid-down invoices was promised to PMI when Culain was presenting PMI with the option of factoring its invoices, and applied for more than 1.5 years under the Agreement.

63. But Culain's promises to PMI and its actions under the Agreement with regard to Residual Payment calculation were a ruse, employed by Culain to cause PMI to enter into the Agreement, knowing that it would later use a FactorSoft error excuse to capture all of the invoice payments. Or, when PMI first discovered Residual Payment calculation errors, Culain used the opportunity to defraud PMI, clinging to a bad faith construction of the Agreement to justify its improper actions.

64. Discovery will reveal that Culain either planned from the outset of the Agreement that it would adopt a new construction of application of the Variable Discount under the Agreement, outwardly blaming FactorSoft's operational controls, applying the Variable Discount on the face amount of each invoice until it was paid in full, increasing the amount claimed by Culain by $1,320,042 through March 3, 2026, with $907,862 net owed to PMI. Or, Culain adopted the plan after learning of the FactorSoft calculation errors revealed by PMI, either way, an act of fraud.

65. Culain knew and intended this revisionist construction would place financial pressure on PMI, especially given that Culain controlled through its portal and Lockbox the entire stream of revenue from PMI's ERC customers.

66. Indeed, all PMI ERC customers, whether their invoices were factored or not factored, tendered invoice payments to Culain, which decided at the Agreement's execution or in October 2024, but adopted the policy starting on or about October 15, 2024 (and no later than November 2024), to delay, and ultimately withhold, such payments because it unilaterally claimed the Variable Discount was improperly applied, and Culain needed to recapture what it claimed were Residual Payment overpayments.

67. Culain's bad faith escalated over time. Beginning in or about mid-October 2024 (and no later than November 2024) and continuing through late February 2025, Culain delayed payments owed to PMI. During that period, Culain informed PMI that unless collections materially improved, it would reconsider how funds were remitted to PMI. In late February 2025, Culain began withholding PMI's non-factored collections, remitting only 50% of those collections—up to $60,000 per week—and applying the balance toward PMI's alleged outstanding debt on the Residual Payments overpayments. PMI had no meaningful choice but to accept Culain's 50% arrangement; the alternative was receiving nothing. And, ultimately, PMI did receive nothing. Since January 12, 2026, Culain has stopped making any payments to PMI.

68. Culain planned to and is withholding payments on PMI's non-factored accounts (which were never purchased by Culain) in the Reserve Account, asserting authority under Agreement Sections 4.1 and 5.4, an act of fraud. Culain has no contractual basis to withhold such non-factored payments in order to collect what it claims were Residual Payment overpayments.

69. Such non-factored account receivables are being captured by Culain in the Reserve Account apparently as hostage (i) to recover what Culain considers to be overpayment of Residual Payments that were allegedly miscalculated by Culain's application of the FactorSoft program, a dubious basis given that there is no contractual authority to direct such Residual Payments to the

Reserve Account for alleged overpayment recovery; and (ii) because PMI has not produced 12 months of detailed bank statements demanded by Culain.

70. While Culain demands that PMI produce its bank records directly to Culain, Agreement Section 6.5 authorizes a field examination only, not production of PMI's banking records. Culain, a Buffalo company, has never requested to inspect PMI's books and records at PMI's California facility.

71. No Event of Default by PMI has been noticed or declared by Culain.

72. There is no contractual or legal basis for Culain to misdirect the Residual Payments due PMI to the Reserve Account as a penalty for not producing PMI's bank records either via a field inspection or PMI sending the bank statements to Culain.

73. Culain is collecting the Receivables from the Eligible Receivables but not fully crediting them to PMI's account, including non-factored receivables that Culain is improperly collecting and converting. Such actions violate the Agreement.

74. Culain charges a percentage for the first 30 days, accrued and paid at the time of each factored collection as an adjustment to the Reserve Account, and then a per diem fee for each day after day 30, until the invoice is paid in full.

75. Under the Agreement, the discount for the first 30 days is 1.30% (Item 8); the per diem discount for days 31-180 is 0.0417%, and the per diem discount for days 181+ is 0.05833%.

76. Pursuant to Agreement Items 8-10, the per diem discount is accrued daily and charged to PMI. There is no practical difference between the discount and interest, and no legal distinction under New York law, confirming that, among other reasons, the economic arrangement pursuant to the Agreement constitutes a loan.

77. Culain refuses to apply the aggregate amount of Collections to PMI's account because Culain, planning from the commencement of the Agreement or starting in October 2024, and springing the scheme into effect on or about October 15, 2024 (and no later than November 2024), interprets the Residual Payment Fee calculations as applying to the face amount of the invoice until paid in full, rather than to the reduced amount of the invoice as it was being paid down.

78. The initial Culain construction of the Variable Discount when applied to the Residual Payment was consistent with the Agreement. But starting on or about October 15, 2024, (and no later than November 2024), Culain invented as an excuse the non-performing FactorSoft program to explain its alleged miscalculations of the Residual Payments, a ruse Culain planned from the outset of the Agreement to lure PMI into entering the Agreement for a minimum two-year term, or planned in October 2024. Culain knew it could later recapture the alleged Residual Payment "overpayments" by converting all payments to the Reserve Account.

79. The Residual Payments are due within two Business Days, in which the Settlement Account receives Collections as the process is detailed in Agreement Section 4.1. Culain is improperly withholding the Residual Payments legitimately due PMI to recover the amounts Culain unilaterally has determined are to be clawed back.

80. Such failure to timely remit the Residual Payments also is willful and constitutes an intentional and material breach of the Agreement.

81. In addition to the Agreement breaches concerning the Residual Payments, Culain currently holds $2,768,318 in the Reserve Account, which is 426% of the $650,000 contractual cap under Agreement Section 5.4(a), a further material breach of the Agreement.

82. After the dispute arose by Culain demanding that PMI bank records be sent directly to Culain rather than Culain conducting an examination of the bank records at PMI's office, Culain started sending Notices of Assignment to PMI's customers, presumably under Section 6.4 of the Agreement, which authorizes such notices if there is an occurrence of an Event of Default.

83. While the Agreement does not require Culain to notice an Event of Default, to date, no Event of Default has been noticed by Culain, and Culain has not informed PMI that an Event of Default has occurred.

84. The Notices of Assignment dispatched to PMI's customers include at least two erroneous and false statements:

(i) "the Company has sold and assigned all of its accounts receivable to Culain as purchaser and as security for its obligations under the Agreement." This statement is false because PMI has only sold invoices (accounts receivables) which Culain has agreed to purchase pursuant to the Agreement, that is, a Purchased Receivable. Culain has not purchased all of the PMI invoices even though PMI has collaterally assigned to Culain its account receivables as security, which is not an assignment; and

(ii) "Under the provisions of the Agreement and the Uniform Commercial Code, all of the Company's accounts receivable are the property of Culain." This statement is false because Culain has a security interest in PMI's non-purchased accounts receivable and an ownership interest in those invoices which are Purchased Receivables. UCC Article 9 permits a secured party, without need for judicial approval, to give notice to account debtors and demand that the debtors pay the secured party directly; here, not all of the PMI's accounts receivable are the property of Culain.

85. Culain's Notices of Assignment direct the PMI customer to remit payments directly to Culain (via various payment alternatives to various addresses / banks depending upon the mode of customer payment), not through the Lockbox contemplated by the Agreement and to which Lockbox address all PMI customers invoices are requested, but instead to a different Culain account whereby Culain exercises unilateral dominion and control.

86. There is no authority under the Agreement for Culain to direct such customer payments pursuant to the Notices of Assignment.

87. The false statements contained in the Notices of Assignment, and the customer confusion they are intended to cause and have caused, have harmed PMI because its customers do not merely rely upon PMI for ERC services, but for other tax and financial services and guidance.

88. When PMI's customers learn from a third-party factor with whom they have never dealt that the customer's payments are to be directed to the third-party, which falsely claims to own the account and/or payments, customer confusion abounds as to the company with whom it is doing business, and PMI's customers may be remiss to continue to engage PMI for future business or recommend PMI to other potential customers.

89. PMI customers are accustomed to conducting business and working with PMI, but when falsely informed by an unknown third-party that their account and/or account receivables are "sold" or are "the property" of Culain, the customer does not know with whom it is working for the valuable tax services it contracted with PMI to receive. Such confusion is driving away existing and potential customers and damaging PMI by causing it to lose future business and standing among its existing customers.

90. Prior to the parties retaining counsel with regard to Culain's failure to remit the Residual Payments to PMI and its improper seizing of non-factored invoice payments, Culain had not let PMI know of any representation, warranty, or Agreement breach, or an Event of Default.

91. Culain has no basis to engage in self-help, which is not a contractual option or recognized under New York law, by withholding the Residual Payments under the false premise of populating the Reserve Account until Culain is unilaterally satisfied that its claimed overpayment of Residual Payments due to improper Variable Discount calculations has been recovered.

92. Under New York law, rendered applicable under Agreement Section 11.1, even if Culain claims to be the non-breaching Agreement party, it had a choice when confronted with the alleged Variable Discount overpayment: stop receiving the Agreement's benefits and demand or sue for total breach, or affirm the Agreement by continuing to perform while suing for partial breach.

93. When a party elects to continue to receive benefits under a contract (in this case, the right to purchase the Eligible Receivables and receive the PMI customer account payments), the party cannot unilaterally change or suspend its performance (here, diverting the Residual Payments to the Reserve Account to recover allegedly overpaid Residual Payments) as a means of self-help to remedy what it claims was a mistaken payment or even a counterparty breach.

94. Culain did not seek to terminate the Agreement or even seek to negotiate a return from PMI of the allegedly overpaid Residual Payments, but rather continues to conduct business under the Agreement in a unilateral manner that benefits Culain, including by diverting the Residual Payments to the Reserve Account to recover the alleged overpayments.

95. Culain is consistently calculating the Residual Payment based upon receipt of each periodic PMI customer payment on each invoice, in many cases with multiple payments being made with respect to a single invoice.

96. On or about June 24, 2025, PMI informed Culain that it was considering tendering a third-party financed payment to Culain to buy out the Purchased Receivables and terminate the Agreement. PMI's CFO also discussed this topic in person with Tim Sardinia (a Culain consultant) in New York City.

97. In response, Culain, preferring not to lose one of its most profitable customers, but if it did lose PMI, hoping to extract as much from the balance of the relationship as possible, applied its revisionist Variable Discount calculation that started on or about October 15, 2024 to the buyout of the Purchased Receivables, which caused Culain's buyout offer at that time to increase by nearly $865,000.

98. Culain's construction of the Agreement such that the Residual Payment is calculated using the Variable Discount applied consistently through the date that the entire aggregated invoice amount is paid in full, ignoring receipt of periodic payments under the subject invoice and ignoring how Culain previously construed the Agreement with regard to applying the Variable Discount, grossly overstates the amount due to Culain to repurchase the outstanding receivables.

99. Such construction is a bad faith and intentional material breach of the Agreement, which has substantially harmed PMI and deprived PMI of the benefit of the bargain of the Agreement, fundamentally changing the purpose of the Agreement.

100. PMI has calculated the amount owed to PMI as of March 3, 2026, based upon the bad faith construction of the Agreement as $907,862, determined by taking the sum of the

outstanding principal, as reflected in the FactorSoft Debtor Aging Report, and adding the fees that those outstanding debtors would generate if all payments were collected as of March 3, 2026 less the amounts held in the Reserve Account and amounts Culain overcharged PMI.

101. To the extent Culain believes it under-applied the Variable Discount for a period, attributing such error to Culain's own software program, Culain cannot recover such alleged overpayments by improperly capturing legitimate Residual Payments due PMI under the Agreement (or by capturing non-factored account payments) and placing them into the Reserve Account.

102. Culain has no contractual authority to unilaterally capture present and future Residual Payments for holding in the Reserve Account in order to apply them to prior, allegedly under-calculated and overpaid, Residual Payments.

103. Culain cannot invent a bad faith construction of the Agreement to recapture what it claims are miscalculated Residual Payments by diverting subsequent Residual Payments legitimately owed to PMI to the Reserve Account, financially strangling PMI.

104. PMI has been substantially and irreparably damaged by Culain's actions, including its bad faith and willfully intransigent construction of the Agreement.

105. PMI has suffered and will continue to suffer irreparable damage and harm, including that it no longer has an adequate flow of funds from Culain, which has terminated the payments due to PMI, causing PMI to miss payroll and rendering PMI unable to pay its day-to-day expenses for operations.

106. PMI's CEO has been forced to extend personal monies to PMI to keep the business going, in order not to close, which closure would cause PMI to lay off or terminate no fewer than

eight employees, all of whom face separation from the company due to Culain's financial and Agreement construction intentional mischief.

107. Culain has intentionally cut-off PMI's funds and is improperly capturing the payments due from PMI ERC customer invoices. Additionally, Culain used its revised Variable Discount calculation, which started on or about October 15, 2024, to artificially inflate its buy out price in retaliation for PMI, months later, seeking an Agreement exit.

108. Without the immediate and continued flow of Residual Payments, indeed all payments due PMI under the Agreement, PMI cannot continue as a going concern, and will fail, closing or filing for bankruptcy.

109. The flow of funds through the Residual Payments is the financial lifeline to PMI, and without such uninterrupted stream of payments, PMI will fail.

110. PMI does not have sufficient funds or revenue to continue as a business without the Residual Payments being remitted to PMI.

111. The amount of funds PMI has liquid without the Residual Payments continuing is insufficient to fund the continued business or operation of the company.

112. Absent a court order requiring Culain to return the Residual Payments and the payments for non-factored invoices to PMI in concert with the promises Culain made to PMI about how the process worked; how Culain interpreted the Agreement for the initial 1.5 years; and how such Residual Payments are to be calculated under the Agreement, PMI will fail as a business.

113. PMI does not have sufficient funds nor means of financing to continue as a going concern without the immediate return of all payments due PMI under the Agreement.

**C. <u>Usury</u>**

114. The Variable Discount is effective interest.

115. Under New York law, if a borrower establishes the defense of usury in a civil action, the usurious loan transaction is deemed void and unenforceable, resulting in the uncollectability of both principal and interest. Whether a transaction is a "loan" for purposes of usury, contemplates the substance of the transaction, not its form.

116. The Agreement is styled as a factoring arrangement, but New York courts evaluate whether an agreement is a loan or a merchant agreement by examining, among other things established by the relationship, whether there is a reconciliation provision; an indefinite term; and if the aggrieved party has any recourse should the merchant declare bankruptcy.

117. The Agreement excludes an indefinite term clause.

118. The Agreement excludes a guarantee.

119. Culain obtained credit insurance on the Agreement and has not had to submit a credit insurance claim. In fact, Culain's Mr. Heim explained in an email to PMI that if a credit insurance claim ever was submitted, Culain *"would pull the nonpayment from the cash reserve and then replenish the reserve once our claim was settled by the insurance company. We would remit back the 35% reserve less fees and any short pay by the insurance company."*

120. Thus, if Culain was not paid by a PMI customer on a Purchased Receivable due to that customer's financial inability to pay, Culain would initially charge PMI's Reserve Account, and then seek an insurance payment to replenish the cash deducted from the Reserve Account, causing PMI to incur fees and any insurance shortfall – Culain is never at risk of a loss, thus rendering Culain not a factor in the true factoring sense.

121. That Culain has no risk is further illustrated by the fact that in May 2024, one of PMI's customers filed for bankruptcy protection with an outstanding receivable of more than $40,000. The account was a Purchased Receivable by Culain under the Agreement, but Culain did not sustain any loss as the owner of the receivable nor did Culain, as owner of that Receivable, file a proof of claim; instead Culain charged PMI's Reserve Account in the amount of that Receivable to cover the customer's non-remitted payment, causing PMI to take the risk and, subsequently, the loss. That is not the hallmark of a true sale.

122. The absence of risk to Culain is even assisted by PMI, which engaged a dedicated Collection Manager and collection attorney which, among commencing actions against non-paying customers, assisted in the collection of payments owed PMI, further insulating Culain against risk of non-payment.

123. The Agreement is not a merchant agreement, which generally applies to electronic payment services, but operates under New York law as a loan agreement, including that it required a minimum payment Closing Fee (Item 18: $80,000) and contemplates numerous other costs and fees attributed to or paid by PMI, all of which are considered in determining the effective interest rate for purposes of discerning whether it reaches the statutory usury amount.

124. Agreement Sections 5.1(f) and 9.2 provide that, upon the occurrence of an Event of Default or termination, Culain has the right to require PMI to repurchase the outstanding Purchased Receivables. Termination by PMI as part of a refinancing also triggers repurchase of all outstanding Purchased Receivables.

125. Events of Default under the Agreement include representation and warranty breaches, among other things that have nothing to do with credit risk.

126. Culain has taken the position that the Variable Discount continues until the Purchased Receivable is paid in full, a backdoor escape from credit risk.

127. The Agreement provides for the Variable Discount in perpetuity.

128. Agreement Section 7.1 allows Culain to maintain its lien until all Purchased Receivables have been paid in full, preventing PMI from refinancing. Section 7.1 thereby effectively removes credit risk for the outstanding Purchased Receivables because Culain will not release the lien until the Purchased Receivables are recovered by PMI.

129. Agreement Section 5.1(a) and the Definitions section deem the Purchased Receivable disputed after the passage of a period from the account's receipt of funds, the equivalent of an eligibility period.

130. Agreement Section 3.1 requires PMI to acquire Purchased Receivables owed from a debtor which exceeds the credit limit for that debtor. The credit limit is unilaterally adjustable by Culain, allowing Culain to force a repurchase by reducing the credit limit.

131. Culain's ability to manufacture a repurchase event by reducing a debtor credit limit is inconsistent with a true sale.

132. The Agreement further provides that if an Event of Default occurs, in which bankruptcy is included, Culain may still enforce its rights to collect the amounts due it under the Agreement or require PMI to repurchase the Purchased Receivables, among other remedies.

133. The arrangement under the Agreement is not a true factoring or similar business transaction, but is a loan.

134. Under New York law, even if an agreement includes a reconciliation provision, it still may be considered a loan if it is discretionary.

135. New York's usury law renders commercial loans subject to New York's criminal usury statute under N.Y. Penal Law § 190.40, which imposes a 25% maximum interest rate. When considering usury, New York courts examine the breadth of the entire corporate transaction and documents, including all fees and expenses chargeable under the instrument.

136. Any transaction that is the equivalent of a corporate loan is void and unenforceable if the interest rate amounts to criminal usury.

137. Under New York law, a lender which knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding 25% per annum is subject to a Class E Felony under N.Y. Penal Law § 190.40.

138. Under New York law, companies may void a loan obligation if the interest rate rises to the level of 25% criminal usury. *See* N.Y. Gen. Oblig. Law §§ 5-501, 5-521(3); N.Y. Penal Law § 190.40.

139. Under New York law, intent to violate the statutory usury rate is not considered.

140. Culain refers to itself as a <u>lender</u> in the Agreement at Section 8.7 *("Buyer's right to bring an action for breach of any such representation . . . shall survive . . . until . . . all other Obligations have been . . . paid to Lender in cash and performed in full.")* and in the definition of Early Termination Fee *("Buyer and Seller . . . acknowledges . . . that the . . . early termination fee . . . reasonable calculation of Lender's lost profits . . .;"* Agreement p. 20).

141. Taking into account all of the fees and expenses PMI incurred under the Agreement, coupled with the rate subject to the Variable Discount, the effective annualized interest rate charged by Culain is 48.8%, substantially above the criminal usury standard under New York law.

142. The interest rate charged by Culain for each individual invoice exceeds 25%.

143. The total interest charged, fees, and other expenses incurred under the Agreement, coupled with the nature of the loan proves the annualized interest rate charged on collected factored receivables, is 48.8%, an interest rate greatly exceeding the New York criminal usury rate under N.Y. Penal Law §§ 190.40, 190.42.

144. The Agreement is void ab initio and unenforceable.

**FIRST CAUSE OF ACTION**
**(Injunction)**

145. Plaintiff repeats, realleges, and incorporates by reference the allegations and statements in the foregoing paragraphs as if set forth here in full.

146. Culain has improperly seized Residual Payments due PMI, including payments owed from non-factored accounts, without any contractual basis or justification.

147. The Agreement does not authorize or allow Culain to withhold payments it receives from PMI customers through invoice payments that are not Purchased Receivables as a penalty for what Culain perceives to be a contract breach by PMI or to leverage what Culain perceives to be overpayments of the Residual Payments.

148. Culain has improperly and unlawfully seized, held, diverted, and converted Residual Payments due PMI, causing PMI substantial harm, including that PMI cannot pay its bills, employee wages or compensation, or expenses required for day-to-day operation. PMI's inability to pay its operational costs, employee wages, and other fees and expenses as a going concern is a direct and proximate result of Culain improperly seizing the Residual Payments and other payments due PMI under the Agreement.

149. Because all PMI customer invoice payments are directed in the invoice to be remitted to Culain, and are remitted to Culain through the Lockbox, Culain controls all of PMI's

ERC customer invoice payments; indeed, Culain receives and controls all of the revenue PMI is to receive through its ERC customers.

150. Culain's actions in seizing all non-factored invoice payments, and not rendering payments to PMI for Purchased Receivables, all to recapture what it claims are Residual Payment overpayments caused by its software program's error in applying the Variable Discount, have caused PMI to suffer a complete loss of revenue, which if continued for the next 30 days will cause PMI to shutter. Such loss is not merely possible, speculative, or remote, but is actual and existing harm suffered by PMI.

151. PMI will suffer the loss of its entire business absent the injunctive relief requested herein, as it cannot continue operations without a return of the flow of Residual Payments.

152. The loss of PMI, an ongoing business representing many years of effort and the livelihood of its several employees, constitutes irreparable harm. What PMI stands to lose cannot be fully compensated by subsequent monetary damages.

153. The equities tip decidedly in favor of PMI, because Culain will suffer no losses by returning to the calculation method of the Variable Discount applied by Culain during the initial 1.5 years of the parties' relationship under the Agreement.

154. The owners of PMI, however, stand to lose the business forever. PMI's business is based almost exclusively upon the percentages of ERC payments received by its customers, and the business will be destroyed if no revenue is derived from such payments, the same revenue that has been unilaterally seized by Culain in violation of the Agreement and pursuant to a fraudulent construction of the Agreement intended to deprive PMI of its entitled Residual Payments.

155. If PMI's application for a preliminary injunction is not granted, it will not have sufficient funds to continue its day-to-day operations, pay employees, solicit customers, serve

customers, and retain a staff to service customers. Monetary damages, which remain important to PMI to recover the Residual Payments, cannot fully compensate PMI for what it stands to lose – its entire business.

156. PMI has no other lines of business sufficient to maintain its ERC-based operations.

157. Culain's bad faith and intentional false construction of the Agreement to justify Culain seizing all invoice payments to recover for a software error alleged overpayment of Residual Payments has choked-off all of PMI's revenue for its tax consulting business, rendering PMI on the verge of closing, and terminating its staff.

158. Absent an injunction preventing Culain from seizing revenue and payments tied to non-factored accounts and invoices, and a return of the Residual Payments as contractually required under the Agreement and consistent with how Culain calculated the Residual Payments for the first 1.5 years, PMI will shutter.

159. Other than PMI's CEO, Mike Anthony personally loaning funds to keep PMI operating, PMI will close or file for bankruptcy protection unless an injunction resulting in the renewed flow of funds rightfully due PMI is granted.

160. The harm that PMI will suffer is irreparable in the sense that PMI will cease to exist absent the requested injunctive relief. That reality also serves the balance of equities when considering whether an injunction is appropriate; absent the injunctive relief sought herein, not maintaining the status quo, PMI's business will be eliminated.

161. PMI is entitled to an injunction without posting a bond enjoining Culain from withholding Residual Payments due for (i) non-factored invoices; and (ii) factored invoices under the premise that payments are to be recovered for alleged overpayments for Residual Payments based upon the improper application of the Variable Discount.

162. An injunction should issue requiring Culain to immediately release all of these payments and to refrain from any continued withholding of such payments based upon Culain's improper construction of the Agreement regarding how the Variable Discount is applied. The Variable Discount is to be applied to the balance of the invoice, not the face amount of the invoice until it is fully paid.

163. No bond should be required given the circumstances of this action as the only damages recoverable from an injunction bond are those arising from the operation of the injunction itself and not from damages occasioned by the suit independently of the injunction.

**SECOND CAUSE OF ACTION**
**(Fraud)**

164. Plaintiff repeats, realleges, and incorporates by reference the allegations and statements in the foregoing paragraphs as if set forth here in full.

165. Culain either intended from before the Agreement was entered or decided on or about October 15, 2024 to apply the Variable Discount to the face amount of all factored invoices until they were paid in full, but in negotiating the Agreement with PMI, informed and promised PMI that the Variable Discount would be applied to the reduced amount of the invoice as it was paid down when tax credit payments were received by the customer from the IRS.

166. Discovery will reveal whether the Culain decision to change the way the Variable Discount was applied to determine the Residual Payments was made before the Agreement was executed or was made before, on, or about October 15, 2024, but in either event, was made deliberately to defraud PMI from the proper Residual Payments due under the Agreement.

167. Culain expected, and PMI relied upon pre-Agreement promises and representations about how the Residual Payments would be calculated (to the reduced amount of customer invoices) when deciding to enter into the Agreement.

168. Culain knew that PMI would not enter into the Agreement if PMI understood that Culain would, at the outset of the Agreement or at any point during its term, calculate the Variable Discount in a way to reduce the Residual Payments to PMI even though the customer invoice was being paid-down.

169. It was the plan and intention of Culain to dupe PMI to enter into the Agreement with the understanding and belief that the Variable Discount would be applied to each factored invoice based upon the reduced amount of the open invoice as it was paid down by the PMI customer, rather than the total face amount of the invoice until the invoice was fully paid.

170. As part of its scheme, Culain informed PMI before entering into the Agreement that it would apply the Variable Discount to the reduced amount of each factored invoice, and, indeed, applied the Variable Discount to such reduced invoice amounts for approximately the first 1.5 years of commerce under the Agreement, hoping, and realizing that PMI would not terminate the Agreement as it was its right until that period passed.

171. That is, Culain lured PMI into extending the Agreement, knowing that it would spring into existence its scheme to recapture the alleged overpaid Residual Payments by capturing non-factored invoice payments and not remitting future Residual Payments.

172. Culain's scheme never risked it not being fully paid the amounts due under its Agreement construction that applied the Variable Discount to the face amount of each invoice until paid in full, because Culain knew it would recapture all such payments by seizing all payments due under the future invoices – factored and non-factored – until it recovered the full amount of the Residual Payments that Culain falsely claims it is owed.

173. Culain's plan was to promise a construction of the parties' business relationship in which the Variable Discount was applied to the reduced balance of the paid-down invoice amount,

and then adopt such Agreement construction for a period in which PMI became comfortable with, and dependent upon the business relationship, later springing upon PMI the revised Variable Discount construction in order to seize all future invoices to recapture the amounts Culain unilaterally claims were overpaid.

174. Culain knew and intended that its plan would cause PMI harm and knew and intended that it could seize all PMI invoices as part of its scheme – Culain using the fact that it would receive and control all PMI customer payments to recover what Culain claimed were the overpayments.

175. Culain knew and intended, and planned to enter into the Agreement under the false premise of applying the Variable Discount to invoice amounts reduced by PMI customer payment, but then would change its construction of the Agreement and apply the Variable Discount to the face amount of the invoice until paid in full, a scheme to recover a higher percentage of PMI customer invoice payments.

176. Culain's fraud, whether planned at the outset of the Agreement or on or about October 15, 2024, had a goal to extract larger interest payments, and pay reduced amounts to PMI under the Agreement.

177. Culain intentionally deceived PMI into a contract construction and promise as to how the Variable Discount would work and be applied, knowing the inexperienced PMI, which did not have an attorney assist with the Agreement, could be duped and taken advantage of with regard to how the important Residual Payments were calculated and remitted.

178. Culain constructed its fraud in order to extract as much money as it could through the PMI customer invoice payments, knowing the vulnerable PMI could be persuaded into the

Agreement, which Culain would later fraudulently interpret in a way which deprived PMI of the important invoice payments that Culain knew PMI relied upon for its existence.

179. Culain's fraud has damaged PMI in an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments. PMI is entitled to nine percent (9%) statutory interest on amounts improperly withheld.

180. In addition, PMI is entitled to punitive damages in an amount sufficient to deter the predatory lender, Culain from engaging in such future conduct in an amount not less than five million dollars ($5,000,000).

## <u>THIRD CAUSE OF ACTION</u>
## (Breach of Contract)

181. Plaintiff repeats, realleges, and incorporates by reference the allegations and statements in the foregoing paragraphs as if set forth here in full.

182. Culain has breached the Agreement by calculating and applying the Variable Discount to each factored invoice based upon the face amount of the open invoice even as it was paid down, rather than applying the Variable Discount to the reduced amount of the open invoice as it was paid by the PMI customer.

183. Culain informed PMI before entering into the Agreement that it would apply the Variable Discount to the reduced amount of each factored invoice, and treated each invoice that way for more than 1.5 years after the Effective Date of the Agreement. Culain has no contractual authority to apply the Variable Discount to the face amount of the invoice until paid in full.

184. The Variable Discount is required under the Agreement to be applied to the reduced amount of the customer paid-down invoice, a fact confirmed by how Culain treated application of the Variable Discount from the outset of the Agreement.

185. Culain also materially breached the Agreement by seizing and withholding payments due for non-factored invoices, that is, Eligible Receivables that are not purchased by Culain, and thus are not converted to Purchased Receivables. For all Receivables that are not Purchased Receivables, there is no contractual basis for Culain to withhold such payments due PMI.

186. Instead, Culain is improperly holding such payments in order to satisfy what it claims were overpayments on Residual Payments.

187. Culain has materially breached the Agreement by applying the Variable Discount to the face amount of each invoice until paid in full and by declining to remit payments due under non-factored invoices until it recovers the full amount of the Residual Payments that Culain falsely claims it is owed.

188. Culain has materially breached the Agreement in order to secure payments to which it is not entitled under the Agreement, including holding payments for non-factored invoices, that is, non-Purchased Receivables.

189. In addition, Culain materially breached the Agreement by currently holding $2,768,318 in the Reserve Account, which is 426% of the $650,000 contractual cap under Agreement Section 5.4(a).

190. Culain's material breach of the Agreement has damaged PMI in an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from

at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments. PMI is entitled to nine percent (9%) statutory interest on amounts improperly withheld.

191. In addition, Culain's material breaches of the Agreement go to the heart of the parties' relationship, the heart of the Agreement, and have destroyed the fundamental benefit of the bargain of the parties' agreement, warranting termination of the Agreement.

192. Culain's breaches as described herein are so substantial that they defeat the core purpose of the Agreement and have undermined the parties' bargained-for-exchange.

193. The material breaches have destroyed the Agreement's purpose because PMI is not receiving any benefits under the construction of the Agreement adopted by Culain, depriving PMI of expected, promised, and contractually required Residual Payments, warranting termination of the Agreement.

194. When a contract party so materially breaches such that the purpose and fundamental bargain of the agreement is defeated, the contract may be terminated, a situation presented by Culain's material Agreement breaches as pleaded herein. The Agreement should be terminated, with the Court awarding to PMI the contract breach damages pleaded herein.

## FOURTH CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing – In the Alternative)**

195. Plaintiff repeats, realleges, and incorporates by reference the allegations and statements in the foregoing paragraphs as if set forth here in full.

196. Every contract subject to New York law has an implicit and non-waivable covenant of good faith and fair dealing. The covenant of good faith and fair dealing can be breached by a contract party even if the contract itself has not been breached.

197. A claim for breach of the implicit covenant exists alongside or independent of a breach of contract claim, particularly when a contract party exercises contract construction or discretion in a way that, even if compliant with the contract, may be designed to undercut its purpose.

198. The implied covenant of good faith and fair dealing prohibits a contract party from interpreting the agreement in a way that is malicious or acts as a scheme to deprive the other party of the benefit of the bargain, especially when the party has treated and constructed the contract in a different way during its performance.

199. The implicit covenant is invoked if a contract party seeks to evade the purpose or understanding of the parties' bargain or business relationship under the Agreement; abuses its power under the contract to specify terms or to direct actions based upon possibly ambiguous terms; or fails to cooperate in the other party's performance.

200. Under New York law, a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when the party exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain.

201. A contract party may not exercise contractual power for an illegitimate purpose and in bad faith as part of a scheme to deprive the other party of benefits of their contractual bargain.

202. Under New York law, when one party to a contract deceives the other party and delays or prevents the exercise of that party's contractual rights, that party breaches the implied covenant of good faith and fair dealing.

203. Under New York law, an implied covenant of good faith and fair dealing claim exists as an independent cause of action if premised on specific, bad faith conduct distinct from

express obligations and does not depend on a breach of the contract. If the contract party defeats the purpose of the contract based upon an unreasonable construction of the contract, the implied duty of good faith and fair dealing is an independent claim.

204. New York courts have repeatedly affirmed the availability of a stand-alone good faith and fair dealing claim as long as it is distinct from any breach of contract claim, and will often find such a standalone claim exists where a contract party alleges bad faith conduct that was not encompassed by express obligations.

205. Culain has materially breached the Agreement's implied covenant of good faith and fair dealing by calculating and applying the Variable Discount to each factored invoice based upon the face amount of the open invoice even as it is paid down, rather than applying the Variable Discount to the reduced amount of the open invoice as it is paid by the PMI customer, a construction that financially disfavors PMI and is not consistent with how Culain described the Variable Discount to PMI when the contract was being considered, and with how Culain treated the Variable Discount calculation for 1.5 years under the Agreement.

206. Even if the Court concludes that Culain reasonably interpreted the relevant Agreement language which Culain claims authorizes the preferred treatment and application of the Variable Discount to the invoice face amount until paid in full, Culain has violated the covenant of good faith and fair dealing because such treatment is not consistent with what PMI was informed by Culain before entering into the Agreement, and how Culain treated Residual Payments for each invoice for 1.5 years after the Effective Date of the Agreement, and, indeed such construction deprives PMI of the benefit of payments under its invoices.

207. Even if the Reserve Account is used to capture all alleged overpayments, the implied covenant of good faith and fair dealing is violated because Culain is capturing factored

and non-factored invoices to recover amounts that Culain has determined it unilaterally overpaid PMI (if, indeed such overpayments occurred), and then unilaterally paying itself.

208. Culain is using the Agreement in a bad faith way to divert all ERC customer payments to pay itself back the alleged Variable Discount (Residual Payments) overpayments, rewarding itself at the financial expense of PMI for its own error. Culain cannot seize the non-factored customer payments in a bad faith way to recover what it claims were overpayments on the Residual Payments.

209. Culain knew and understood that PMI relies upon receipt of funds for its financial existence for non-factored invoices, but has unreasonably construed the Agreement to allow Culain to seize all payments related to non-Purchased Receivables, harming PMI.

210. Culain cannot construe the Agreement for 1.5 years in a way which resulted in the Residual Payments flowing to PMI based upon application of the Variable Discount, and then in bad faith, decide it made overpayments to PMI inventing a different contract construction, clawing-back such alleged overpayments by seizing non-factored customer invoices.

211. Even if Culain announces contractual authority to apply the Variable Discount to the face amount of the invoice until paid in full, such contract construction deprives PMI of the benefit of the bargain of the Agreement.

212. Even if Culain or the Court construes the Agreement to authorize Culain's seizure of non-factored invoice payments to recover alleged overpayments to PMI caused by an error in applying the Variable Discount, such contract construction deprives PMI of the benefit of the bargain of the Agreement because PMI had no way to know or understand, and no way to expect that Culain would have any autonomy over non-factored invoice payments.

213. Culain violated the implied covenant of good faith and fair dealing by seizing and withholding payments due for non-factored invoices, that is, Eligible Receivables that are not purchased by Culain, and thus are not converted to Purchased Receivables. For all Receivables that are not Purchased Receivables, there is no basis for Culain to withhold such payments due PMI, and PMI is being deprived of the benefit of the bargain of the Agreement by Culain holding payments due under non-factored invoices.

214. Even if Culain cites Agreement authority to divert the ERC customer invoice payments to the Reserve Account in order to recover alleged Residual Payment overpayments, Culain in a separate act of bad faith has construed how such Residual Payments are calculated by applying the Variable Discount to the face amount of the invoice through full payment, rather than on the reduced amount of the invoice as it is paid-down by the PMI customer.

215. Culain has violated the implied covenant of good faith and fair dealing by inventing an excuse to hold non-factored invoice payments in order to satisfy what it claims were overpayments on Residual Payments.

216. Culain has breached the implied covenant of good faith and fair dealing by applying the Variable Discount to the face amount of each invoice until paid in full.

217. Culain's breach of the Agreement's implied covenant of good faith and fair dealing has damaged PMI in an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments. PMI is entitled to nine percent (9%) statutory interest on amounts improperly withheld.

**FIFTH CAUSE OF ACTION**
**(Conversion)**

218. Plaintiff repeats, realleges, and incorporates by reference the allegations and statements in the foregoing paragraphs as if set forth here in full.

219. Culain has converted the payments withheld by Culain by calculating and applying the Variable Discount to each factored invoice based upon the face amount of the open invoice even as it is paid down, rather than applying the Variable Discount to the reduced amount of the open invoice as it is paid by the PMI customer.

220. Culain has converted the payments withheld by Culain by its seizure of non-factored invoice payments to recover alleged overpayments to PMI caused by an error in applying the Variable Discount.

221. Culain's conversion of funds by withholding payments due for non-factored invoices and by misapplying the Variable Discount, both as detailed herein, has harmed PMI, depriving PMI of financial benefits required under the Agreement.

222. Culain's conversion has damaged PMI in an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments. PMI is entitled to nine percent (9%) statutory interest on amounts improperly withheld.

**SIXTH CAUSE OF ACTION**
**(Declaratory Judgment)**

223. Plaintiff repeats, realleges, and incorporates by reference the allegations and statements in the foregoing paragraphs as if set forth here in full.

224. PMI is entitled to a declaration, given the prevailing language of the Agreement, that Culain cannot calculate and apply the Variable Discount to each factored invoice based upon the face amount of the open invoice; instead, the Variable Discount should be applied to the reduced amount of the open PMI customer invoice as it is paid down by the customer. Such construction of the Agreement is consistent with Section 4 and Item 10 of the Agreement.

225. PMI is entitled to a declaration that Culain has no authority under the Agreement to withhold payments due for non-factored invoices, that is, Eligible Receivables that are not purchased by Culain.

226. For all Receivables that are not Purchased Receivables, PMI is entitled to a declaration that there is no basis for Culain to withhold such payments due PMI, as PMI is being deprived of the benefit of the bargain of the Agreement by Culain holding payments due under non-factored invoices.

**WHEREFORE,** PMI demands judgment against Culain:

A. For the First Cause of Action for an Injunction to enjoin Culain from withholding payments due to (i) Culain's application of the Variable Discount to the face amount of PMI invoices until they are paid in full; instead, the Variable Discount is applied to the reduced amount of the invoice as it is paid by the PMI customer; and (ii) non-factored invoices and to refrain from any continued withholding of such payments based upon Culain's improper construction of the Agreement regarding how the Variable Discount is applied. The Variable Discount is to be applied to the balance of the invoice, not the face amount of the invoice until it is fully paid. All seized payments and monies withheld from PMI should be immediately released to PMI by Culain;

B. For the Second Cause of Action for Fraud, PMI is entitled to an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments, plus nine percent (9%) statutory interest on amounts improperly withheld. PMI also is entitled to punitive damages for Culain's fraud in an amount set by the court in order to deter such future conduct by Culain but not less than five million dollars ($5,000,000);

C. For the Third Cause of Action for Breach of Contract, PMI is entitled to termination of the Agreement due to various material contract breaches; in addition to an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-

factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments, plus nine percent (9%) statutory interest on amounts improperly withheld;

D. For the Fourth Cause of Action for Breach of Implied Covenant of Good Faith and Fair Dealing, PMI is entitled to an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments, plus nine percent (9%) statutory interest on amounts improperly withheld;

E. For the Fifth Cause of Action for Conversion, PMI is entitled to an amount to be proven at trial, including (i) at least $1,320,042 in excess fees charged and retained by Culain on factored collections to date; (ii) Residual Payments improperly withheld by Culain from PMI from at least October 2024 (and no later than November 2024) to present; and (iii) payments due PMI for non-factored accounts that have been held and converted by Culain under the guise of recapturing alleged Variable Discount overpayments, plus nine percent (9%) statutory interest on amounts improperly withheld; and

F. For the Sixth Cause of Action for Declaratory Judgment, the Court should declare that Culain (i) cannot calculate and apply the Variable Discount to each factored invoice based upon the face amount of the open invoice; instead, the Variable Discount should be applied to the reduced amount of the open PMI customer invoice as it is paid down by the customer; and (ii) has no authority under the Agreement to withhold payments due for non-factored invoices, that is,

Eligible Receivables that are not purchased by Culain; for all Receivables that are not Purchased Receivables, PMI is entitled to receive such payments.

Dated: New York, New York
March 17, 2026

**BLANK ROME LLP**

*/s/ Gregory P. Cronin*
Samuel D. Levy*
Gregory P. Cronin
Molly E. Henneberry*
1271 Avenue of the Americas
New York, New York 10020
212-885-5352
samuel.levy@blankrome.com
gregory.cronin@blankrome.com
molly.henneberry@blankrome.com
*Pro Hac Vice Forthcoming

*Counsel for Plaintiff, Pinnacle Minds, Inc.*