# EXHIBIT A

EXECUTION COPY

# FACTORING AGREEMENT

**BETWEEN**

**CULAIN CAPITAL FUNDING LLC**
**(“BUYER”)**

**AND**

**PINNACLE MINDS, INC.**
**(“SELLER”)**

**DATED APRIL 20, 2023**

## TABLE OF CONTENTS

**1. DEFINITIONS.** ..... **1**

**2. ASSIGNMENT OF RECEIVABLES; OFFER FOR SALE OF ELIGIBLE RECEIVABLES BY SELLER; PURCHASE OF ELIGIBLE RECEIVABLES BY BUYER.** ..... **1**

2.1. Offer of Receivables for Purchase. ..... 1
2.2. Funding Requests; Deliveries. ..... 1
2.3. Sales of Receivables. ..... 2
2.4. Purchase of Eligible Receivables by Buyer. ..... 2
2.5. Effect of Purchase of Receivables by Buyer. ..... 2

**3. MAXIMUM FACILITY AMOUNT; OVERADVANCES.** ..... **2**

3.1. Overadvances. ..... 2
3.2. Increase of Purchased Receivable Limit. ..... 3
3.3. Failure to Fund Accordion; Termination. ..... 3

**4. RECEIVABLES PURCHASE PRICE.** ..... **4**

4.1. Purchase Price for Purchased Receivables. ..... 4
4.2. Calculation of the Initial Payment. ..... 4
4.3. Calculation of Residual Payment. ..... 4
4.4. Purchase Price Defined Terms. ..... 4
4.5. Fees, Costs and Expenses. ..... 5
4.6. Manner of Payments to Seller. ..... 5

**5. REPURCHASE OR REPLACEMENT OF PURCHASED RECEIVABLES; RESERVE ACCOUNT.** ..... **6**

5.1. Repurchase, Replacement and Charges to Reserve Account. ..... 6
5.2. Buyer's Acceptance of Credit Risk. ..... 6
5.3. No Reassignment. ..... 7
5.4. Reserve Account. ..... 7

**6. ADMINISTRATION AND SERVICING OF ACCOUNTS.** ..... **8**

6.1. Lockbox; Collection Account. ..... 8
6.2. Payments in Trust. ..... 8
6.3. Crediting of Collections; Receipt of Funds by Buyer. ..... 8
6.4. Authorization of Buyer. ..... 9
6.5. Field Examinations and Inspections. ..... 10

**7. COLLATERAL AND SECURITY INTEREST.** ..... **10**

7.1. Grant of Security Interest in Collateral. ..... 10
7.2. Security Agreement. ..... 10
7.3. Security Acknowledgment. ..... 11

**8. REPRESENTATIONS, WARRANTIES AND COVENANTS BY SELLER.** ..... **11**

8.1. Seller Representations, Warranties and Covenants. ..... 11
8.2. Seller Notification; Disputed Receivables. ..... 12
8.3. Financial Statements; Tax Returns. ..... 12
8.4. Deposit Accounts; Buyer Access. ..... 12
8.5. Right of First Refusal. ..... 12
8.6. Indemnification of Buyer. ..... 13
8.7. Survival of Representations, Warranties and Covenants. ..... 13

**9. EVENTS OF DEFAULT; REMEDIES.** ..... **13**

9.1. Events of Default. ..... 13
9.2. Rights and Remedies Upon Event of Default. ..... 14
9.3. No Notice or Waiver. ..... 14

**10. TERM TERMINATION; RELEASE OF LIENS.** ..... **15**

10.1. Initial Term; Renewal Terms. ..... 15
10.2. Termination for Funding Failure. ..... 15

10.3. No Lien Termination without Release. ....15
**11. GENERAL PROVISIONS. ....15**
11.1. Governing Law; Jurisdiction; No Jury Trial. ....15
11.2. Rights and Remedies Cumulative....16
11.3. Reinstatement....16
11.4. Successors and Assigns. ....17
11.5. Marketing and Advertising. ....17
11.6. Headings....17
11.7. Severability. ....17
11.8. Notice....17
11.9. Strict Performance. ....17
11.10. Construction of Agreement. ....18
11.11. Buyer's Performance. ....18
11.12. Entire Agreement; Amendments; Buyer's Consent....18
11.13. Execution in Counterparts....18
**SCHEDULE OF ADDITIONAL TERMS ....18**
**DEFINITIONS SCHEDULE....23**
**EXHIBIT A FORM OF PURCHASE OFFER....29**
**EXHIBIT B FORM OF ASSIGNMENT AGREEMENT ....30**
**EXHIBIT C FORM OF SCHEDULE OF ASSIGNED ACCOUNTS ....31**

**THIS FACTORING AGREEMENT** (this "***Agreement***") is made as of April 20, 2023 (the "***Effective Date***") between **PINNACLE MINDS, INC.**, a corporation organized under the laws of the State of California ("***Seller***"), and **CULAIN CAPITAL FUNDING LLC**, a limited liability company organized under the laws of the State of Delaware ("***Buyer***").

**RECITALS**:

Seller wishes to obtain financing by factoring, selling and assigning to Buyer certain accounts receivable, at a discount below face value, in accordance with and subject to the terms and conditions of this Agreement. Buyer is willing to purchase accounts receivable from Seller from time to time, upon the terms and subject to the conditions set forth in this Agreement.

**AGREEMENT**:

**1. Definitions.** Unless defined in the Recitals, above, in the body of this Agreement, or in the Exhibits or other Schedules hereto, capitalized terms have the meanings given to such terms in the **Definitions Schedule**. The **Definitions Schedule** and the **Schedule of Additional Terms** also provide meanings for certain other phrases used in this Agreement (whether or not capitalized). Each term defined in the singular shall be interpreted in a collective manner when used in the plural, and each term defined in the plural shall be interpreted in an individual manner when used in the singular.

**2. Assignment of Receivables; Offer for Sale of Eligible Receivables by Seller; Purchase of Eligible Receivables by Buyer.**

*2.1. Offer of Receivables for Purchase.* At its election from time to time during the Term of this Agreement, and subject to the terms and conditions of this Agreement, Seller agrees to assign to Buyer certain of Seller's Receivables, and to offer for sale to Buyer certain of Seller's Eligible Receivables, and to sell to Buyer on the terms set forth in this Agreement such of the offered Eligible Receivables as Buyer may accept for purchase. Buyer shall have the right to reject any offered Receivable that fails to meet the definition of an Eligible Receivable or that otherwise is an Ineligible Receivable.

*2.2. Funding Requests; Deliveries.* In connection with each offer of Eligible Receivables to Buyer, Seller agrees to deliver to Buyer (a) a completed **Purchase Offer** in the form of **Exhibit A** attached hereto, (b) a completed **Assignment Agreement** in the form of **Exhibit B** attached hereto, and if delivered in electronic or other digital format (such as .pdf) a **Schedule of Assigned Accounts** in the form of **Exhibit C** attached hereto and attached to such Assignment Agreement describing the Eligible Receivables covered by such Purchase Offer and Assignment Agreement, validity executed by Seller and submitted to Buyer, (c) a copy of all purchase orders, the Exclusive Consulting Agreement between Seller and Account Debtor or other similar agreements and requests for the provision of goods or services relating to the Eligible Receivables described therein, a copy of Seller's invoices relating to the Eligible Receivables described therein, and evidence of Seller's delivery of the related goods or performance of the related services described in each such invoice including the completed Forms 941-X (or Forms 944-X for annual filers) and Form 8821, all in a form satisfactory to Buyer, (d) simultaneous with delivery of the documents and information described above, a detailed report of Seller's agings of all of Seller's Receivables, and (e) such other information described in **Item 5** of the **Schedule of Additional Terms** (each related Purchase Offer, Assignment Agreement, Schedule of Assigned Accounts, copies of associated purchase orders and invoices, and such other required information shall be referred to as a "***Funding Request***"). Seller shall deliver each Funding Request and related invoices and other documentation to Buyer either (i) through the client portal provided to Seller through Buyer's FactorSoft system ("***Client Portal***"), or (ii) by forwarding to Buyer by electronic mail (*i.e.*, email) such Funding Request and all related information in digital or other electronic format (including by attachment of .pdf versions of documents). If Seller uses the Client Portal to submit a Funding Request to Buyer, Seller acknowledges and agrees that all Purchased Receivables and invoices included in such Funding Request shall be included in, and may be attached by Buyer as, the Schedule of Accounts to the Assignment Agreement relating to such Funding Request and presented by Buyer to third parties, including

Account Debtors, as Seller's duly executed Assignment of Accounts and Schedule of Accounts relating thereto.

*2.3. Sales of Receivables.* Seller hereby acknowledges and agrees that Seller's inclusion of any Eligible Receivable in a Funding Request shall evidence Seller's offer to sell, transfer, assign and otherwise convey to Buyer, as a sale by Seller and a purchase by Buyer, and not as security for any indebtedness or other obligation of Seller to Buyer, all right, title and interest of Seller in and to all Eligible Receivables included in such Funding Request, together with all related rights (but not obligations) of Seller with respect thereto, including all contract rights, guarantees, letters of credit, liens in favor of Seller, insurance and other agreements and arrangements of whatever character from time to time supporting or securing payment of each such Receivable and all right, title and interest of Seller in any related goods, including Seller's rights and remedies under Article 2, Part 7 of the UCC.

*2.4. Purchase of Eligible Receivables by Buyer.* Buyer's acceptance for purchase of any offered Eligible Receivable shall be evidenced by Buyer's tender of the "Initial Payment" (as defined in **Section 4.2**) to Seller or otherwise delivering or making available to Seller through the Client Portal a schedule or report of Eligible Receivables accepted for purchase by Buyer. Seller's offer for sale of any Receivable to Buyer shall not be effective as to any Receivable not accepted for purchase by Buyer. Each Eligible Receivable purchased by Buyer pursuant to the terms hereof shall be referred to as a "***Purchased Receivable***".

*2.5. Effect of Purchase of Receivables by Buyer.*

2.5(a) The sale, transfer, assignment and conveyance of any Purchased Receivable to Buyer does not constitute and is not intended to result in an assumption by Buyer of any obligation of Seller or any other Person in connection with such Purchased Receivable or related rights or under any agreement or instrument relating thereto.

2.5(b) Seller agrees to execute and deliver such bills of sale, assignments, letters of credit, notices of assignment, financing statements (including continuation statements) under the UCC and other documents supporting the payment of or otherwise relating to each Purchased Receivable, and make such entries and markings in its books and records, and to take all such other actions (including the negotiation, assignment or transfer of negotiable documents, letters of credit or other instruments) as Buyer may reasonably request to further evidence or protect the sales and assignments of Purchased Receivables and related rights to Buyer hereunder.

2.5(c) After a Purchased Receivable has been purchased by Buyer, Seller shall not have the right to (i) vary, modify, alter or otherwise change the terms of sale set forth in the invoice relating to such Purchased Receivable or otherwise as agreed to by Seller and such Customer, or (ii) offer or accept any compromise, discount or substitution with respect to such invoice or Purchased Receivable, or (iii) vary, modify, alter or otherwise change any other aspect of such invoice or Purchased Receivable. Notwithstanding the foregoing provisions of this **Section 2.5(c)**, Buyer acknowledges that each invoice supporting a Purchased Receivable is subject to adjustment based on the amount of the ERC Credit determined by the Internal Revenue Service for the applicable Customer or Account Debtor (an "***IRS ERC Adjustment***"). In the event any invoice supporting a Purchased Receivable is adjusted pursuant to an IRS ERC Adjustment, Seller and Buyer shall cooperate to provide the respective Customer or Account Debtor with a revised invoice reflecting such IRS ERC Adjustment, and any downward IRS ERC Adjustment shall be addressed pursuant to the provisions of **Section 5.1** of this Agreement.

**3. Maximum Facility Amount; Overadvances.**

*3.1. Overadvances.* The parties agree that, without the prior consent of Buyer (y) the maximum amount of uncollected Purchased Receivables outstanding as of any time will not exceed the Purchased Receivable Limit, and (z) the maximum amount of uncollected Purchased Receivables owing from a Customer or an Account Debtor will not exceed such Customer's or Account Debtor's Credit Limit. If (a) the aggregate amount of uncollected Purchased Receivables at any time exceeds the Purchased Receivable Limit for any reason, or (b) the aggregate amount of uncollected Purchased Receivables from a Customer or an Account Debtor exceeds such Customer's or Account Debtor's Credit Limit (the amount of any such excess to be

referred to as an "***Overadvance***"), then (i) such Overadvance will constitute an overpayment by Buyer of the Purchase Price for Purchased Receivables for purposes of this Agreement, (ii) payment of such Overadvance will be secured by the Collateral, and (iii) (A) Seller shall immediately repay the amount of such Overadvance without notice or demand by Buyer, and/or (B) Buyer may charge the amount of such Overadvance to the Reserve Account and deduct the amount therefrom, and/or (C) Buyer may deduct the amount of such Overadvance from all proceeds of all Receivables then in the possession of Buyer or received by Buyer after the creation of such Overadvance (whether or not the proceeds of any such Receivables derives from Purchased Receivables) until Buyer has been repaid the amount of such Overadvance in full, and/or (D) Buyer may in Buyer's sole discretion refrain from purchasing any additional Eligible Receivables until the Overadvance has been repaid to Buyer in full.

*3.2. Increase of Purchased Receivable Limit.* Seller may, at any time and from time to time, upon prior written notice to Buyer, request to increase the Purchased Receivable Limit; *provided* that:

3.2(a) Buyer, in Buyer's sole discretion, shall have approved such proposed increase in the Purchased Receivable Limit;

3.2(b) the sum of the aggregate principal amount of any increases in the Purchased Receivable Limit pursuant to this **Section 3.2** shall not exceed Ten Million and 00/100 Dollars ($10,000,000.00), such that the Purchased Receivable Limit shall not, under any circumstances, exceed Twenty Million and 00/100 Dollars ($20,000,000.00);

3.2(c) Buyer shall not approve more than three (3) such proposed increase in the Purchased Receivable Limit;

3.2(d) any such increase shall be in a minimum principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) unless Buyer, in its sole discretion, approves an increase of a lesser amount;

3.2(e) no Default or Event of Default shall exist before and immediately after giving effect to such increase;

3.2(f) no Default or Event of Default shall, on a pro forma basis, occur immediately after giving effect to such increase;

3.2(g) in the event Buyer assigns all or any portion of such increase to a participant or co-Buyer (a "***Participant***"), in Buyer's sole discretion (i) such Participant shall either execute and deliver to Buyer such agreements, documents and instruments in form and content acceptable to Buyer in its sole discretion to evidence its participation in the transactions evidenced by this Agreement, or (ii) such Participant shall join this Agreement by executing and delivering such joinder agreements, documents and instruments in form and content acceptable to Buyer in its sole discretion;

3.2(h) any such increase in the Purchased Receivable Limit shall be subject to receipt by the Buyer of a certificate of Seller dated as of the date of such increase signed by an Authorized Officer of Seller (x) certifying and attaching the resolutions adopted by Seller approving or consenting to such increase, and (y) certifying that, before and after giving effect to such increase (i) the representations and warranties contained in in this Agreement and the other Factoring Documents are true and correct in all material respects on and as of the date of such increase, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date, and (ii) no Default or Event of Default exists; and

3.2(i) all costs, fees and expenses of Buyer and any Participants (including, for the avoidance of doubt, all fees, costs and expenses of counsel to the Buyer and the Participants) in connection with such increase in the Purchased Receivable Limit shall have been paid by Seller prior to the effective date of such increase.

*3.3. Failure to Fund Accordion; Termination.* In the event Seller elects to exercise its right to increase the Purchase Receivable Limit pursuant to **Section 3.2**, above, and all conditions described in **Section 3.2** have been satisfied other than Buuyer's consent to such increase pursuant to **Section 3.2(a)**, then in such event Seller shall be permitted to terminate this Agreement upon fifteen (15) calendar days' written notice to Buyer. Upon termination of this Agreement pursuant to this Section 3.3, Seller shall repurchase all outstanding Purchased Receivables from Buyer in an aggregate amount equal to the Initial Payments for such

repurchased Receivables and the then-due Fixed Discounts and Variable Discount applicable to such repurchased Receivables, plus all amounts then due to Buyer pursuant to the terms of this Agreement; provided, however, in such event the Early Termination Fee (if applicable) described in **Item 18** of the **Schedule of Additional Terms** shall be waived and not chargeable to Seller

**4. Receivables Purchase Price.**

*4.1. Purchase Price for Purchased Receivables.* The purchase price for each Eligible Receivable purchased hereunder shall consist of and be paid by Buyer's payment to Seller of the "Initial Payment" (as defined in **Section 4.2**) and the "Residual Payment" (as defined in **Section 4.3**) with respect to such Purchased Receivable. The Initial Payment with respect to a Purchased Receivable shall be payable by Buyer to Seller (a) if such Purchased Receivable is not a Material Eligible Receivable (i) within twenty four (24) hours of Buyer's receipt of a Funding Request including such Purchased Receivable from Seller if the Funding Request was received by Buyer on or before the "Funding Request Deadline" (as defined in **Item 6** of the **Schedule of Additional Terms**) on a Business Day, or (ii) on the Business Day immediately following such twenty four (24) hour period if the Funding Request was received by Buyer after the Funding Request Deadline on a Business Day, or Buyer receives the Funding Request including such Purchased Receivable on any day that is not a Business Day, and (b) if such Purchased Receivable is a Material Eligible Receivable (i) within five (5) Business Days of Buyer's receipt of a Funding Request including such Purchased Receivable from Seller if the Funding Request was received by Buyer on or before the "Funding Request Deadline" (as defined in **Item 6** of the **Schedule of Additional Terms**) on a Business Day, or (ii) on the Business Day immediately following such five day period if the Funding Request was received by Buyer after the Funding Request Deadline on a Business Day, or Buyer receives the Funding Request including such Purchased Receivable on any day that is not a Business Day. The Residual Payment with respect to a Purchased Receivable shall be payable by Buyer to Seller via wire transfer within two (2) Business Days following the Business Day in which the Settlement Account receives Collections consisting of the proceeds of collection for the subject Purchased Receivable in an amount equal to the "Gross Amount" or "Net Amount" (as such terms are defined in **Section 4.4**) of such Purchased Receivable used to determine the Initial Payment, as applicable, subject to Buyer's right to withhold, offset and charge against each Residual Payment for funding of the Reserve Account as described in **Section 5.4**), for the repayment of any Overadvance as described in **Section 3**, for fees, costs and expenses payable to Buyer in accordance with the terms of this Agreement, and as otherwise permitted pursuant to the terms of this Agreement.

*4.2. Calculation of the Initial Payment.* The "***Initial Payment***" with respect to a Purchased Receivable means the lesser of the "Gross Amount" or "Net Amount" (as defined below) of such Purchased Receivable, multiplied by the "Initial Payment Rate" as defined in **Item 7** of the **Schedule of Additional Terms.**

*4.3. Calculation of Residual Payment.* The "***Residual Payment***" with respect to a Purchased Receivable means the aggregate amount of Collections received by Buyer and credited to Seller's account pursuant to the terms of this Agreement with respect to such Purchased Receivable in an amount equal to the lesser of the "Gross Amount" or "Net Amount" of such Purchased Receivable used to determine the Initial Payment, as applicable, less the sum of (a) the Initial Payment with respect to such Purchased Receivable, plus (b) the "Fixed Discount" and the "Variable Discount" (as such terms are defined in **Section 4.4**) applicable to such Purchased Receivable, plus (c) the amount of such Purchased Receivable credited to the "Reserve Account" (as defined in **Section 5.4**), plus (d) all fees, costs and expenses payable by Seller to Buyer pursuant to the terms of this Agreement (including but not limited to any and all attorneys' fees and other costs of collection) relating to such Purchased Receivable. The Fixed Discount with respect to a Purchased Receivable will be fully due and payable to Buyer and charged to Seller's account at the time of Buyer's purchase of such Purchased Receivable, and monthly at the end of each month, or at the end of any portion of a month if less than a full month, during the Fixed Discount Period. The Variable Discount will be charged to Seller's account monthly at the end of each month, or at the end of any portion of a month if less than a full month, after the end of the Fixed Discount Period until the related Purchased Receivable is paid in full.

*4.4. Purchase Price Defined Terms.* For purposes of this Agreement (a) the "***Gross Amount***" means, with respect to a Purchased Receivable, the gross face amount payable in United States Dollars pursuant to the

invoice relating to such Purchased Receivable, (b) the "***Net Amount***" of a Purchased Receivable means the Gross Amount of such Purchased Receivable, less all permitted discounts, deductions and allowances stated in the invoice relating to such Purchased Receivable, (c) "***Fixed Discount***" means a discount of the Gross Amount or Net Amount of a Purchased Receivable used to determine the Initial Payment, as applicable, with respect to such Purchased Receivable equal to such amount and for such term, as defined in **Item 8** of the **Schedule of Additional Terms**, (d) "***Variable Discount***" means a discount computed on the Gross Amount or Net Amount of a Purchased Receivable used to determine the Initial Payment, as applicable, with respect to such Purchased Receivable, at the rate and for such period as described in **Item 10** of the **Schedule of Additional Terms**.

*4.5. Fees, Costs and Expenses.* In addition to the Fixed Discounts, Variable Discounts, other discounts, fees and other charges payable to Buyer hereunder:

*4.5(a) Misdirected Payment Fee*. Seller shall pay to Buyer any Misdirected Payment Fee immediately upon its accrual, and Buyer may (a) charge to and withdraw from the Reserve Account such Misdirected Payment Fee, and/or (b) deduct such Misdirected Payment Fee from all proceeds of all Receivables then in the possession of Buyer or received by Buyer in the future. Notwithstanding the foregoing, the Misdirected Payment Fee shall not be chargeable on payments which are directed to the account of the Seller rather than the Lockbox or Collection Account during the Misdirected Payment Waiver Period as described in **Item 17** of the **Schedule of Additional Terms**.

*4.5(b) Reimbursable Expenses*. Seller shall reimburse Buyer for all fees, costs and expenses directly incurred by Buyer (i) if Buyer employs counsel for advice or other representation, (ii) reasonably incurs legal fees or expenses, consulting fees or expenses, fees, costs or expenses of external professionals engaged by Buyer, or (iii) reasonably incurs other out-of-pocket costs or expenses in connection with: (a) the exercise of any right, remedy, power, benefit or privilege of Buyer described in this Agreement or any other Factoring Document; (b) any amendment, modification or restatement of this Agreement or any other Factoring Document; (c) periodic field exams or audits and appraisals performed by Buyer following the occurrence of an Event of Default; (d) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Buyer, Seller or any other person) in any way relating to the Accounts, the Collateral, this Agreement or Seller's business or affairs; (e) the establishment, attachment, perfection or protection of any Security Interest or lien on the Collateral; (f) any attempt to enforce any right, remedy, power, benefit or privilege of Buyer against Seller or any other Person who may be obligated to Buyer by virtue of this Agreement or any other Factoring Document, including, without limitation, Account Debtors, Persons providing any guaranty of the Obligations or any Secondary Obligor; (g) any attempt to inspect, verify, protect, preserve, restore, collect, sell, lease, license, liquidate or otherwise dispose of or realize upon the Collateral; or (h) in conducting and completion of due diligence, collateral examinations and appraisals, credit investigations, lien searches and other due diligence matters reasonably determined by Buyer as necessary and appropriate, and in connection with the negotiation, drafting, preparation and consummation of this Agreement and the other Factoring Documents; then, in any such event, all reasonable attorneys' fees arising from such services and all expenses, costs and charges of such counsel, all fees, costs, expenses and charges of consultants and professionals engaged by Buyer, and all other costs and out-of-pocket expenses of Buyer relating to any of the events or actions described above shall be payable by Seller to Buyer, and shall be additional Obligations under this Agreement secured by the Collateral. With respect to any amount paid by Buyer and required to be reimbursed by Seller pursuant to the provisions of this **Section 4.5(b)**, Seller agrees that Buyer may (i) charge to and withdraw from the Reserve Account such unpaid amount until Buyer has been paid the unpaid amount in full, and/or (b) deduct such unpaid amount from all proceeds of all Receivables then in the possession of Buyer or received by Buyer in the future until Buyer has been paid the unpaid amount in full, and/or (c) require Seller to reimburse Buyer immediately in cash.

*4.5(c) Additional Fees and Expenses*. Seller shall pay for and/or reimburse Buyer for such additional fees and expenses described in **Item 18** of the **Schedule of Additional Terms**.

*4.6. Manner of Payments to Seller.* All payments by Buyer to Seller, and all payments from Seller to Buyer (specifically including payments required to be made to Buyer by Seller pursuant to **Sections 3.1**, **4.5(b)**,

**5.1**, **5.3**, **5.4**, **6.1(b)**, **6.2**, **6.3**, **8.6**, and **9.2**) unless otherwise received or reimbursed to Buyer pursuant to the terms of this Agreement), will be effected by ACH transfer or by wire transfer. In order to accommodate ACH transfers, Seller hereby authorizes Buyer to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located. Except for ACH debits initiated by Buyer pursuant to the provisions of **Sections 6.1(b)** and **9.2**, prior to Buyer's exercise of its right to debit Seller's account by ACH for amounts owed to Buyer pursuant to the terms hereof (a) Buyer shall have provided Seller with written notice of the amount owed to Buyer and reasonable evidence of the amount and basis for such amount owed to Buyer, (b) Buyer shall have pursued all other applicable remedies available to Buyer as provided in such applicable Section, and (c) Buyer shall have notified Seller in writing that there shall remain any amount owing to Buyer and unpaid after a period of thirty (30) calendar days after Buyer's commencement of such applicable remedy or remedies. Seller shall execute all agreements, documents and instruments required by Seller's bank to implement ACH transfers by Buyer. Seller may only terminate this authorization by giving Buyer the sooner to occur of (i) thirty (30) days prior written notice of termination, or (ii) payment in cash and full satisfaction of all Obligations.

**5. Repurchase or Replacement of Purchased Receivables; Reserve Account.**

*5.1. Repurchase, Replacement and Charges to Reserve Account.* Buyer will have immediate recourse against Seller, and may, if any of the events or conditions described in **Sections 5.1(a)** through **5.1(g)**, inclusive, below, occur, take any one or more of the following remedies in such order as Buyer determines in its sole discretion: (i) require that Seller repurchase a Purchased Receivable from Buyer in an amount equal to the amount of the Initial Payment and the then-due Fixed Discount and Variable Discount applicable to such Purchased Receivable, on demand; or (ii) require that Seller replace a Purchased Receivable with an Eligible Receivable in a Gross Amount no less than the Gross Amount of such Purchased Receivable; or (iii) charge to and withdraw from the Reserve Account the amount of the Initial Payment and the then-due Fixed Discount and Variable Discount applicable to such Purchased Receivable until Buyer has been repaid the amount of the Initial Payment and such Fixed Discount and Variable Discount in full, or (iv) deduct the amount of the Initial Payment and the then-due Fixed Discount and Variable Discount applicable to such Purchased Receivable from all proceeds of all Receivables then in the possession of Buyer or received by Buyer in the future until Buyer has been repaid the amount of the Initial Payment and the Fixed Discount and Variable Discount applicable to such Purchased Receivable in full.

5.1(a) a Purchased Receivable (or any portion thereof) is a Disputed Receivable when tendered to Buyer for sale, or becomes a Disputed Receivable prior to Buyer's receipt of payment in full thereof (specifically including any Purchased Receivable that is not paid in full prior to the Presumed Dispute Date); or

5.1(b) the invoice relating to a Purchased Receivable is decreased pursuant to Seller's pricing terms due to an IRS ERC Adjustment (as such term is defined in **Section 2.5(c)** of this Agreement;

5.1(c) (i) it is discovered that a Purchased Receivable was not an Eligible Receivable, or was an Ineligible Receivable, when tendered to Buyer for sale, or (ii) a Purchased Receivable becomes an Ineligible Receivable prior to Buyer's receipt of payment in full thereof; or

5.1(d) any goods relating to a Purchased Receivable are returned to or repossessed by Seller; or

5.1(e) (i) Seller has breached any of its representations, warranties or covenants with respect to a Purchased Receivable, or (ii) there is any material deficiency, error or inaccuracy in connection with a Purchased Receivable; or

5.1(f) upon the occurrence of an Event of Default, or upon the effective date of termination of this Agreement, in which case Buyer may demand that Seller repurchase all Purchased Receivables; or

5.1(g) if any of the conditions described in **Item 13** of the **Schedule of Additional Terms** have occurred.

*5.2. Buyer's Acceptance of Credit Risk.* For purposes of clarity and confirmation, Buyer accepts all risks of non-payment with respect to a Purchased Receivable, in whole or in part, if such non-payment is solely the result of an Insolvency Claim with respect to the Customer from whom such Purchased Receivable is owed and such Insolvency Claim occurs prior to the earlier of (a) the date such Purchased Receivable becomes

an Ineligible Receivable or otherwise becomes subject to repurchase, replacement or any other right or remedy of Buyer described in **Section 5.1**, or (b) the occurrence of an Event of Default.

*5.3. No Reassignment.* The repurchase of a Purchased Receivable shall not constitute a reassignment thereof for purposes of Buyer's Security Interest in such Receivable or the UCC; Buyer shall retain its Security Interest in such repurchased Purchased Receivable; and in addition to the amounts payable by Seller to Buyer described in **Section 5.1**, Seller shall be liable to pay and shall immediately pay to Buyer an amount equal to all fees, costs and expenses owing to Buyer in connection therewith, until all such amounts are paid to Buyer in full. In the event Seller repurchases a Purchased Receivable, Buyer shall provide the Customer or Account Debtor thereof with a termination of Buyer's Notice of Assignment to such Customer and Account Debtor and coordinate with Seller to provide such Customer or Account Debtor with Seller's revised invoice indicating payment instructions to Seller rather than Buyer. In the case of Seller's replacement of a Purchased Receivable with an Eligible Receivable pursuant to the terms of this **Section 5**, Buyer shall not be required to make any Initial Payment with respect to such replacement Eligible Receivable and the Purchased Receivable being replaced shall thereafter be treated as a Receivable not purchased by Buyer.

*5.4. Reserve Account.* Buyer may, in Buyer's sole discretion, establish an account (the "***Reserve Account***") in such amount as Buyer shall determine from time to time in Buyer's sole discretion to fund any actual or projected shortfall with respect to Variable Discounts, to pay to and reimburse Buyer for any Overadvance pursuant to **Section 3**, to reserve against Buyer's additional risks relating to an Account Debtor's Purchased Receivables exceeding the Concentration Limit, to fund any repurchase of a Purchased Receivable pursuant to **Section 5.1**, to pay for any proceeds of Receivables credited to the account of Seller that are not paid to or credited to Buyer pursuant to **Section 6.3**, to pay to and reimburse Buyer for any Disputed Receivable pursuant to **Section 8.2**, to repurchase Purchased Receivables and pay the Obligations in full following an Event of Default as provided in **Paragraphs 9.2(a)** and **9.2(b)**, for the payment of fees, costs and expenses payable to Buyer pursuant to the terms of this Agreement, and such other purposes as described in this Agreement. Subject to the provisions of Section 5.4(b), the Reserve Account shall be funded from the proceeds of Purchased Receivables received by Buyer, and may, in Buyer's sole discretion, be applied against and withheld from one or more Initial Payments and/or one or more Residual Payments with respect to Purchased Receivables until the Reserve Account has been fully funded. Any withdrawal from the Reserve Account by Buyer pursuant to the terms of this Agreement may, in Buyer's sole discretion, be re-funded by applying against and withholding from one or more Initial Payments and/or one or more Residual Payments with respect to Purchased Receivables, and subject to the provisions of **Section 5.4(b)** withholding from the proceeds of all Receivables then in the possession of Buyer or received by Buyer after the such withdrawal (whether or not the proceeds of any such Receivables derives from Purchased Receivables) until the Reserve Account has been fully funded.

5.4(a) *Initial Reserve Percentage; Maximum Reserve Amount*. Subject to the provisions of this **Section 5.4**, Buyer shall initially reserve ten percent (10.0%) of the Gross Amount or Net Amount of each Purchased Receivable used to determine the Initial Payment with respect to such Purchased Receivable, as applicable, to fund the Reserve Account, until proceeds deposited in the Reserve Account equal, at any time, five percent (5.0%) of the aggregate outstanding and unpaid amount of Initial Payments at such time; *provided that* in no event shall the aggregate amount of proceeds deposited and held in the Reserve Account exceed an amount equal to Six Hundred Fifty Thousand and 00/100 Dollars ($650,000.00).

5.4(b) *Funding of Reserve Account after Lockbox Restart Date; Reserve Percentage Following Lockbox Restart Date*. Following a Lockbox Restart Date (i) Buyer shall notify Seller of the amount of the withdrawal from the Reserve Account, shall provide Seller with reasonable evidence of the amount and basis for such withdrawal, and Seller shall remit the full amount of such withdrawal to Buyer within five (5) Business Days of such notice, (ii) if Seller shall fail to remit the full amount of the amount of the withdrawal from the Reserve Account to Buyer within such five (5) Business Day period, Buyer may debit the unpaid amount from Seller's Account by ACH, and (iii) if any amount withdrawn from the Reserve Account remains unpaid after the events described in clauses (i) and (ii) immediately above, in addition to funding the Reserve Account from the proceeds of Purchased Receivables received by Buyer and by applying against and withholding from one or

more Initial Payments and/or one or more Residual Payments with respect to Purchased Receivables, Buyer may, in Buyer's sole discretion, fund the Reserve Account by withholding from the proceeds of all Receivables then in the possession of Buyer or received by Buyer after such Lockbox Restart Date (whether or not the proceeds of any such Receivables derives from Purchased Receivables) until the Reserve Account has been fully funded, and (ii) Buyer may reserve up to twenty percent (20.0%) of the Gross Amount or Net Amount of each Purchased Receivable used to determine the Initial Payment with respect to such Purchased Receivable, as applicable, to fund the Reserve Account, until the Reserve Account has been fully funded.

**6. Administration and Servicing of Accounts.**

*6.1. Lockbox; Collection Account.*

6.1(a) *Lockbox and Collection Account; Payment Instructions*. Buyer has established a lockbox for the processing of checks and other tangible Collections (as further described in **Item 14** of the **Schedule of Additional Terms**; the "***Lockbox***"), and an account for the deposit of Collections whether from the Lockbox, or directly by wire transfer, ACH or other electronic payment from Account Debtors (as further described in **Item 15** of the **Schedule of Additional Terms**; the "***Collection Account***"). Prior to a Lockbox Suspension Date, and following a Lockbox Restart Date until Buyer has notified Seller that the funding of the Reserve Account has triggered a Lockbox Suspension Date (in accordance with **Section 6.1(b)**), Seller shall instruct all of its Customers and Account Debtors on Seller's invoices to forward all checks and other tangible Collections to the Lockbox, and all ACH, wire transfers and other electronic Collections to the Collection Account, without setoff or other deduction. Buyer may change the Lockbox, and/or the Collection Account at any time upon written notice to Seller. Seller shall require each of its Customers and Account Debtors making a payment of a Purchased Receivable by check or other instrument to make such check or instrument payable to the order of, in Seller's sole discretion (a) Seller, or (b) Buyer, or (c) Seller and Buyer jointly. Collections processed through the Lockbox and shall be deposited into the Collection Account, and all Collections deposited in the Collection Account (whether through the Lockbox, or directly from Seller's Customers and Account Debtors by ACH or wire transfer) will be deposited into the Settlement Account, at such times and in such amounts as directed by the operating procedures of the financial institution(s) with which the Lockbox, and Collection Account have been established.

6.1(b) *Lockbox Suspension Date; Lockbox Restart Date*. Following each date at which the Reserve Account equals Six Hundred Fifty Thousand and 00/100 Dollars (each such date, a "***Lockbox Suspension Date***"), Seller may instruct its Customers and Account Debtors, other than Customers and Account Debtors with respect to which Buyer has purchased or thereafter will purchase a Purchased Receivable, to remit proceeds of such non-Purchased Receivables directly to Seller. If, following a Lockbox Suspension Date, there is any withdrawal from the Reserve Account pursuant to the terms of this Agreement (i) Buyer shall notify Seller of the amount of the withdrawal from the Reserve Account (the date of any such notice, a "***Lockbox Restart Date***"), provide Seller with reasonable evidence of the basis for such withdrawal, and Seller shall remit the full amount of such withdrawal to Buyer within five (5) Business Days of such notice, (ii) if Seller shall fail to remit the full amount of the withdrawal from the Reserve Account to Buyer within such five (5) Business Day period, Buyer may debit the unpaid amount from Seller's Account by ACH, and (iii) if any amount withdrawn from the Reserve Account remains unpaid after the events described in clauses (i) and (ii) immediately above, upon Buyer's written notice to Seller, Seller shall instruct all of its Customers and Account Debtors on Seller's invoices to remit all Collections to the Lockbox and Collection Account in accordance with the provisions of **Section 6.1(a)**, above, until Buyer has notified Seller that the funding of the Reserve Account has triggered a Lockbox Suspension Date.

*6.2. Payments in Trust.* If Seller receives Collections or other Proceeds of Purchased Receivables, such Collections and Proceeds (a) shall be received by Seller and held by Seller in trust for Buyer, (b) will not be commingled with any funds of Seller, and (c) will be delivered by Seller to Buyer, in precisely the form received (except for the endorsement or assignment of Seller where necessary), by the close of business on the next Business Day following receipt by Seller.

*6.3. Crediting of Collections; Receipt of Funds by Buyer.* All funds credited to Seller's account, whether full or partial satisfaction of a Purchased Receivable, are conditional upon final payment to Buyer in cash or

solvent credits of the items giving rise to such funds. If any Collections or other item credited to the payment of any Purchased Receivable, or to Seller's account for any other Receivable which has been paid by Buyer to Seller, is not received by Buyer in full, the amount of any credit given for such item shall be charged to Seller's account whether or not the item is returned, and Buyer may (a) require Seller to immediately repay the amount of such unpaid amount, (b) charge to and withdraw from the Reserve Account the amount of such unpaid amount until Buyer has been paid the unpaid amount in full, and/or (c) deduct such unpaid amount from all proceeds of all Receivables then in the possession of Buyer or received by Buyer in the future until Buyer has been paid the unpaid amount in full. For the purpose of crediting funds to Seller's account, Buyer shall credit funds on the Payment Credit Date applicable to such payment.

*6.4. Authorization of Buyer.* Seller hereby acknowledges that Buyer, at any time and from time to time, may in Buyer's sole discretion (a) forward directly to Account Debtors statements or invoices on Purchased Receivables, (b) subject to the provisions of **Section 6.1(b)**, and notwithstanding to provisions of **Section 6.1(b)** following the occurrence of an Event of Default, deliver to Account Debtors notice of the assignment of Seller's Receivables to Buyer (each, a "***Notice of Assignment***"), (c) subject to the provisions of **Section 6.1(b)**, and notwithstanding to provisions of **Section 6.1(b)** following the occurrence of an Event of Default,, request payment of Receivables to the Lockbox, the Collection Account, or to such address or to such bank account as may be designated by Buyer in Buyer's sole discretion, (d) at any time and without notice to or the consent of Seller, to communicate directly with Seller's Customers and Account Debtors by whatever means Buyer shall elect for the purpose of verifying Purchased Receivables and information supplied by Seller to Buyer pursuant to this Agreement, (e) to execute in the name of Seller and file any Internal Revenue Service ("IRS") forms 8821 or other forms which Buyer may deem necessary in order for Buyer to remain informed on Seller's status with the Internal Revenue Service, (f) pay any sum necessary to discharge any lien, Security Interest or other Encumbrance which is senior to Buyer's Security Interest in the Collateral, which sums shall be included as Obligations hereunder, (g) extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Purchased Receivables and other Collateral which included a monetary obligation, and discharge or release any Customer, Account Debtor or other Obligor with respect to any Purchased Receivable (including filing of any public record releasing any lien, Security Interest or other Encumbrance granted to Seller by such Account Debtor or other Obligor), without affecting any of the Obligations. Seller further acknowledges that Buyer shall have the sole right to collect, sue for and give releases in the name of Seller or Buyer in Buyer's sole discretion, for all amounts due on all Purchased Receivables. Seller specifically authorizes Buyer to endorse, in the name of Seller, all checks, drafts, trade acceptances or other forms of payment tendered by Customers and Account Debtors in payment of Purchased Receivables deposited in the Lockbox or Collection Account or received by Seller and made payable to Buyer. Buyer shall have no liability to Seller for any mistake in the application of any payment received with respect to any Purchased Receivable other than due to Buyer's gross negligence or willful misconduct, IT BEING THE SPECIFIC INTENT OF THE PARTIES HERETO THAT BUYER SHALL HAVE NO LIABILITY HEREUNDER FOR ITS OWN NEGLIGENCE EXCEPT FOR ITS OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. Seller hereby waives notice of nonpayment of any Purchased Receivable as well as any and all other notices with respect to such Purchased Receivables, demands or presentations for payment, and agrees that Buyer may extend or renew from time to time the payment of, or vary or reduce the amount payable under or compromise any of the terms of, any Purchased Receivable, in each case without notice to or the consent of Seller. After the occurrence and during the continuation of an Event of Default (i) Seller further authorizes Buyer (or its designee) to open and remove the contents of any post office box of Seller or Buyer (or its designee) which Buyer believes contains mail relating to Purchased Receivables, and in connection therewith or otherwise, to receive, open and dispose of mail addressed to Seller which Buyer believes may relate to Purchased Receivables, and (ii) Seller hereby irrevocably appoints Buyer (and any employee, agent or other person designated by Buyer, any of whom may act without joinder of the others) as Seller's attorneys-in-fact and agents, in Seller's name, place and stead, to take all actions, execute and deliver all notices, negotiate such instruments and other documents, as may be necessary or advisable to permit Buyer (or its designee), to take any and all of the actions described in this **Section 6.4** or as a Secured Party as permitted by the terms of this Agreement and/or the

UCC with respect to the Purchased Receivables and other Collateral, or to carry out the purpose and intent hereof, as fully and for all intents and purposes as Seller could itself do, and hereby ratifies and consigns all that said attorneys-in-fact and agents may do or cause to be done by virtue hereof. This power of attorney is irrevocable and deemed coupled with an interest.

*6.5. Field Examinations and Inspections.* Seller shall permit Buyer and any authorized representatives designated by Buyer, upon reasonable notice to Seller and during Seller's normal business hours, to visit and inspect any of the properties of Seller, including its financial and accounting records, and to make copies and take extracts therefrom, and to discuss its affairs, finances, and business with its officers at such times during normal business hours and as often as Buyer requests. Buyer may, at any time after the occurrence of an Event of Default, review, inspect and copy all records, files and books relating to Purchased Receivables and the other Collateral located at Seller's premises or otherwise under the control of Seller.

**7. Collateral and Security Interest.**

*7.1. Grant of Security Interest in Collateral.* As security for the final and indefeasible payment to Buyer in cash and performance of Seller's obligations (including but not limited to the repurchase of Purchased Receivables pursuant to the terms hereof), liabilities, indemnification obligations and duties of Seller under the terms of this Agreement (collectively, the "***Obligations***") in full, Seller hereby pledges to Buyer, and grants to Buyer a continuing general lien upon and Security Interest in and to the Collateral. The pledge, lien and Security Interest granted to Buyer pursuant to this Agreement shall continue in full force and effect until (a) all Purchased Receivables have been paid in cash to Buyer in full pursuant to the terms hereof, (b) all Obligations have been finally and indefeasibly paid to Buyer in cash and performed in full, and (c) Seller has provided to Buyer a fully executed Termination Release, notwithstanding the termination of any other Factoring Document (in whole or in part), the termination of Buyer's offer to purchase Receivables under this Agreement, the termination of any other Factoring Document or any other agreement, document or instrument by or between Seller and Buyer, or the repurchase or replacement of any Purchased Receivable by Seller. Any balances to the credit of Seller in the possession of Buyer, and any other property or assets of Seller in the possession of Buyer, shall be held by Buyer as Collateral, and applied in whole or partial satisfaction of the Obligations when due, subject to the terms of this Agreement. Notwithstanding the foregoing, Seller and Buyer acknowledge and agree that all Purchased Receivables shall become the property of Buyer upon the date of purchase thereof by Buyer. Seller will execute and deliver to Buyer security agreements, assignments (including, without limitation, assignments of specific Accounts), and other documents and instruments as Buyer may at any time reasonably request to establish, evidence, attach, perfect, or protect any security interest, pledge, lien, charge, mortgage or other encumbrance granted to Buyer pursuant to this Agreement or any other document between Buyer and Seller or instrument delivered to Buyer in connection therewith. Seller authorizes Buyer to file all financing statements, and all continuations or amendments thereof, and deliver, with or without Seller's execution thereof, any Notice of Assignment to Seller's Customers and Account Debtors as Buyer determines in Buyer's sole discretion, to establish, evidence attach, perfect or protect any Security Interest, pledge, lien, charge, mortgage or other Encumbrance granted to Buyer in the Collateral, and specifically acknowledges is authorization of Buyer to have filed any such financing statements prior to the date of this Agreement. Seller agrees that subject to Seller's rights under Section 9-509(d)(2) of the UCC, Seller is not and shall not be authorized to file any financing statement or amendment, termination or corrective statement with respect to any financing statement filed by Buyer, or with respect to any continuation or amendment thereof, without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole discretion. In addition to all other rights, remedies, powers, benefits or privileges granted to Buyer pursuant to the terms of this Agreement, Buyer shall possess all rights, remedies, powers, benefits or privileges of a "Secured Party" (as such term is defined in the UCC) under and pursuant to the terms and provisions of the UCC.

*7.2. Security Agreement.* Seller acknowledges and agrees that this Agreement shall constitute a "Security Agreement" for purposes of the UCC.

*7.3. Security Acknowledgment.* Notwithstanding the creation and grant of the above Security Interest in favor of Buyer hereunder, the relationship of Buyer and Seller shall be that of a purchaser and seller of Receivables and Accounts, and not that of a lender and borrower.

**8. Representations, Warranties and Covenants by Seller.**

*8.1. Seller Representations, Warranties and Covenants.* As an inducement for Buyer to enter into this Agreement, Seller represents and warrants that the following statements are true and correct, and that until all Obligations are finally and indefeasibly paid to Buyer in full, or any other amount remains owing to Buyer hereunder (whether by Seller, a Customer or an Account Debtor) (i) the same will remain true and correct, and (ii) Seller comply with each covenant and other agreement of Seller below,:

8.1(a) *Receivables Representations and Warranties*. (i) As of the date of Buyer's payment of the Initial Payment to Seller with respect to a Purchased Receivable, to the best of Seller's information and knowledge the Customer or Account Debtor relating to such Purchased Receivable is solvent; (ii) Seller is, at the time of purchase by Buyer, the lawful owner of and has good and undisputed title to each Purchased Receivable; (iii) at the time of purchase by Buyer the Customer or Account Debtor obligated on such Purchased Receivable has no, and to the best of Seller's information and knowledge such Customer or Account Debtor shall have no future, right of set-off, abatement or reduction whatsoever in respect of any Purchased Receivable, unless Buyer has been provided written notice by Seller of any such set-off, abatement or reduction prior to delivery of the Initial Payment with respect to such Purchased Receivable to Seller; (iv) each Purchased Receivable is an accurate statement of indebtedness by the respective Customer or Account Debtor to Seller for a certain sum which is due and payable as provided in Seller's invoice relating to such Purchased Receivable; (v) each Purchased Receivable is an accurate statement of a *bona fide* sale, delivery and acceptance of merchandise or performance of service by Seller to the respective Customer or Account Debtor, or other good and valid liability of the Customer or Account Debtor in question to the Seller; (vi) each Purchased Receivable is current and not past due as of the date of purchase by Buyer, has not been paid by or on behalf of the Customer or Account Debtor in whole or in part; (vii) as of the date of purchase by Buyer no Purchased Receivable is, and to Seller's information and knowledge will not in the future be, subject to any dispute, rescission, set-off, recoupment, defense or claim by the respective Customer or Account Debtor, whether relating to price, quality, quantity, workmanship, delay in delivery, set off, counterclaim or otherwise; (viii) to Seller's information and knowledge the Customer or Account Debtor with respect to a Purchased Receivable has not, and will not after the date of sale of such Receivable to Buyer hereunder, claim any defense of any kind or character (including any Insolvency Claim) against payment of such Purchased Receivable, and; (ix) Seller does not own, control or exercise dominion over, in any way whatsoever, the business of any Customer or Account Debtor liable on a Purchased Receivable; and

8.1(b) *Covenants of Seller.* (i) Seller will not, under any circumstances or in any manner whatsoever, interfere with any of Buyer's rights under this Agreement; (ii) Seller will not request, notify or direct any Customer or Account Debtor to remit payments for Receivables to any address or account other than the Lockbox, or Collection Account or otherwise interfere with Buyer's payment directions as provided in the Notice of Assignment executed by Buyer; (iii) Seller will place on each invoice for a Receivable intended to be offered to Buyer for purchase pursuant to the terms of this Agreement only payment instructions to the Lockbox, and the Collection Account; (iv) Seller will not factor or sell Receivables except to Buyer during the Term of this Agreement; (v) Seller will not offer any Receivable to Buyer for sale that is not an Eligible Receivable, and by offering any Receivable to Buyer, Seller shall be deemed to have represented and warranted that such Receivable is an Eligible Receivable; (vi) Seller will discharge all taxes, levies or assessments imposed upon it or incurred by it in the operation of its business as and when same become due; (vii) subject to the provisions of **Section 2.5(c)** of this Agreement, Seller will not change or modify the terms of the original invoice issued in connection with a Purchased Receivable with a Customer or Account Debtor unless Buyer first consents to such change in writing in Buyer's sole discretion; (viii) Seller will not permit any lien, Security Interest or Encumbrance to be created upon its Accounts or other Collateral except for such liens, Security Interests or other Encumbrances to which Buyer consents in writing in advance in its sole discretion; (ix) Seller will maintain such insurance covering Seller's business and/or Seller's property as

is customary for businesses similar to the business of Seller and, at the request of Buyer, name Buyer as a loss payee of such insurance covering Collateral; (x) Seller shall immediately notify Buyer of any dispute between a Customer or an Account Debtor and Seller; (xi) Seller shall give prompt notice to Buyer if goods relating to a Purchased Receivable are returned to or repossessed by Seller; (xii) Seller will notify Buyer in writing prior to any change in Seller's place of business, or if Seller has or acquires more than one place of business, or prior to any change in Seller's chief executive office, the office or offices where Seller's books and records concerning Accounts or accounts receivable are kept; and (xiii) Seller will notify Buyer at least sixty (60) calendar days in advance of any proposed change of Seller's name, identity, legal entity or corporate structure.

*8.2. <u>Seller Notification; Disputed Receivables.</u>* Seller agrees to notify Buyer immediately of any breach of any of Seller's representations or warranties, or violation of any of Seller's covenants, contained herein or should any representation, warranty, covenant or agreement made by Seller herein become untrue or false at any time. Seller further agrees to notify Buyer immediately of the existence of any Disputed Receivable, the assertion by any Customer or Account Debtor of any dispute or other claim (including any defense or offset asserted by any Customer or Account Debtor) with respect to any Purchased Receivable, or with respect to any related goods or services. Upon Buyer's request, Seller agrees to settle, at its own expense and for the benefit of Buyer, any Disputed Receivable; *provided*, that any such settlement shall be made only with the prior written consent of Buyer. As to any Disputed Receivable, Buyer shall have the rights, remedies, powers, benefits or privileges as provided for and as described in **Section 5.1** with respect to each Disputed Receivable, and in addition thereto (and not in limitation of any such rights, remedies, powers, benefits or privileges), in its sole discretion, Buyer may settle at the expense of Seller (including all attorneys' fees and expenses of Buyer) and for the benefit of Buyer any such dispute or claim upon such terms as Buyer may in its sole discretion deem advisable. A Purchased Receivable with respect to which the Account Debtor has asserted a valid Insolvency Claim shall not be a Disputed Receivable under the terms of this Agreement.

*8.3. <u>Financial Statements; Tax Returns.</u>* Seller shall provide to Buyer such financial statements of Seller and tax returns of Seller, and at such times, as are described in **Item 19** of the **Schedule of Additional Terms**. All financial statements delivered to Buyer pursuant shall fairly present Seller's financial condition and results of operations as of the dates and for the periods covered, and shall not contain any material misstatements.

*8.4. <u>Deposit Accounts; Buyer Access.</u>* Seller will provide Buyer not less than sixty (60) calendar days' written notice prior to opening any Deposit Account or other account at any bank, brokerage firm, Securities Intermediary, Commodities Intermediary, or other financial institution, if such account is not in existence on the date of this Agreement. Seller shall execute and deliver, or cause to be executed and delivered, to Buyer such agreements, documents, and instruments as Buyer deems necessary or desirable Buyer's sole discretion to protect its interests in the Collateral to be maintained, held or processed by or through any Deposit Account or other account owned or maintained by or on behalf of Seller, and Seller shall take such other actions as Buyer may reasonably request in order to cause Buyer to have a perfected, first-priority Security Interest therein. Additionally, Seller shall provide Buyer with all passwords and other information for all of its Deposit Accounts and other accounts in order to enable Buyer to have online, view-only access to such accounts, and Seller will not change any such password or directly or indirectly interfere with Buyer's view-only access to any such account during the Term of this Agreement.

*8.5. <u>Right of First Refusal.</u>* In the event that after the Effective Date Seller intends to replace Buyer and the Receivables purchase facility described in this Agreement, or otherwise incur any indebtedness to replace Buyer and the Receivables purchase facility described in this Agreement, (any such replacement facility or indebtedness, an "***Additional Financing***"), Seller shall offer in writing to Buyer the opportunity to provide such Additional Financing on the terms offered to Seller by any prospective provider thereof and, to the extent Buyer has not agreed or has declined to provide such Additional Financing within ten (10 calendar days following receipt of such offer on such specified terms, Seller may then pursue such opportunity on the same terms to such other provider (it being understood and agreed that Buyer will have no obligation to provide any Additional Financing or provide any such notice).

*8.6. <u>Indemnification of Buyer.</u>* Seller agrees to indemnify and hold all "Indemnified Persons" (as hereinafter defined) harmless against any breach by Seller of any representation, warranty or covenant of Seller contained in this Agreement, and against any claims or damages arising out of the manufacture, sale, possession or use of, or otherwise relating to, goods, or the performance of services, associated with or relating to Receivables, Accounts or related rights purchased (or with respect to which a Security Interest is granted to Buyer) hereunder. The term "***Indemnified Persons***" shall mean Buyer and its officers, directors, members, managers, shareholders, employees, attorneys, representatives, agents, Affiliates, successors and assigns. To the extent that Seller's undertaking to indemnify, pay and hold harmless Buyer as set forth in this **Section 8.6** may be unenforceable because it violates any law or public policy, Seller shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all matters referred to under this **Section 8.6**.

*8.7. <u>Survival of Representations, Warranties and Covenants.</u>* Unless specifically otherwise provided for herein, all representations and warranties of Seller contained in this Agreement shall be true, accurate and complete at the time of Seller's execution of this Agreement, shall be true, accurate and complete on each date that Seller offers a Receivable for purchase to Buyer, and shall be true, accurate and complete on the date each Receivable is purchased by Buyer hereunder. Buyer's right to bring an action for breach of any such representation or warranty or to exercise any right, remedy, power, benefit or privilege under this Agreement or any other Factoring Document based upon the breach of any such representation or warranty shall survive the execution, delivery and acceptance of this Agreement and each other Factoring Document, and the closing of the transactions described in this Agreement, until all Purchased Receivables have been paid in cash to Buyer in full pursuant to the terms hereof and all other Obligations have been finally and indefeasibly paid to Lender in cash and performed in full. Seller shall comply with all covenants of Seller contained in this Agreement until (a) all Purchased Receivables have been paid in cash to Buyer in full pursuant to the terms hereof, (b) all other Obligations have been finally and indefeasibly paid to Buyer in cash and performed in full, and (c) Seller has provided to Buyer a fully executed Termination Release. Buyer's right to bring an action for breach of any such covenant or to exercise any right, remedy, power, benefit or privilege under this Agreement or any other Factoring Document based upon the breach of any such covenant shall survive the execution, delivery and acceptance of this Agreement, and the closing of the transactions described in this Agreement, until all Purchased Receivables have been paid in cash to Buyer in full pursuant to the terms hereof and all other Obligations have been finally and indefeasibly paid to Buyer in cash and performed in full.

**9. Events of Default; Remedies.**

*9.1. <u>Events of Default.</u>* The occurrence of any of the following acts or events will constitute an "***Event of Default***" under this Agreement: (a) if Seller fails to make payment of any of the Obligations when due; (b) if Seller commits any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future amendment, restatement, extension, supplement or other modification hereof or of any other Factoring Document or agreement between Buyer and Seller; (c) if any material service provider is terminated or terminates its relationship with Seller, unless Seller has replaced such service provider with a service provider reasonably satisfactory to Buyer within thirty (30) calendar days of the loss of the original service provider; (d) if Seller becomes insolvent or unable to meet Seller's debts as they mature; (e) if Seller fails to pay when due any material obligations or liabilities owing by Seller to any Person (including without limitation, any United States and state taxes); (f) if Seller calls, or has called by a third party, a meeting of creditors; (g) if any bankruptcy proceeding, insolvency arrangement, receivership or similar proceeding is commenced by or against Seller under any federal, state or other applicable law; (h) if Seller suspends or discontinues doing business for any reason; (i) if a receiver or trustee of any kind is appointed for Seller or any of Seller's property; (j) if there shall be a change in the beneficial ownership and control, directly or indirectly of the majority of the outstanding voting securities or other interests entitled (without regard to the occurrence of any contingency) to elect or appoint members of the board of directors or other managing body of Seller; or (k) if Seller grants to any Person other than Buyer any lien, Security Interest or other Encumbrance on or to any Collateral; (l) if a notice of lien, money judgment,

levy, assessment, seizure or writ, or warrant of attachment is entered or filed against Seller or with respect to the Accounts or any other Collateral in which Seller has granted Buyer a Security Interest; or (m) if Seller sells, leases, transfers or otherwise disposes of all or substantially all of Seller's property or assets, or consolidates with or merges into or with any corporation or entity.

*9.2. Rights and Remedies Upon Event of Default.*

9.2(a) *Termination of Purchase Obligations; Repurchase of Purchased Receivables*. In addition to all other rights, remedies, powers, benefits or privileges granted to Buyer pursuant to the terms of this Agreement, upon the occurrence and during the continuation of an Event of Default other than as described in **Paragraphs (g)** or **(i)** of **Section 9.1**, Buyer will have the right to (i) require Seller to repurchase all Purchased Receivables then unpaid and outstanding at a price for each such Purchased Receivable equal to the unpaid portion of the Initial Payment made by Buyer thereon and the Variable Discount then owing thereon, and (ii) pay to Buyer all outstanding Obligations and all fees (including the Early Termination Fee, if applicable), costs and expenses due and payable to Buyer, and (iii) terminate all obligations to purchase Receivables pursuant to this Agreement and all other arrangements existing between Buyer and Seller, and (iv) set-off or apply (A) the Reserve Account and any and all proceeds of Receivables and other Collateral then in Buyer's possession, and/or (B) any indebtedness or other liability or obligation at any time owing by Buyer to or for the credit or the account of Seller, to Buyer's obligation to repurchase Purchased Receivables and to Seller's payment of the Obligations then owing by Seller to Buyer hereunder, and (v) to withhold any further payments to Seller until Seller has paid to Buyer all amounts due with respect to Purchased Receivables required to be repurchased by Seller and all Obligations have been to paid in cash to Buyer in full, and (vi) take all other and further actions and avail itself of any and all rights, remedies, powers, benefits or privileges available to Buyer under this Agreement, any other agreement between Buyer and Seller or between Buyer and any other Person, and available under law or in equity.

9.2(b) *Immediate Repurchase of Purchased Receivables; Obligations Immediately Due*. Notwithstanding the provisions of **Paragraph 9.2(a)** above, upon the occurrence and during the continuance of an Event of Default described in **Paragraphs (g)** or **(i)** of **Section 9.1**, without notice, demand or other action by Buyer (i) Seller shall immediately repurchase all Purchased Receivables then unpaid and outstanding at a price for each such Purchased Receivable equal to the unpaid portion of Initial Payment made by Buyer thereon and Variable Discount then owing thereon, and (ii) all of Seller's outstanding Obligations to Buyer, and all fees (including the Early Termination Fee, if applicable), costs and expenses due and payable to Buyer shall immediately become due and payable whether or not payable on demand prior to such Event of Default, and (iii) all of Buyer's obligations to purchase Receivables pursuant to this Agreement and all other arrangements existing between Buyer and Seller for Buyer to provide any financing or other accommodation to Seller shall immediately terminate, and (iv) Buyer shall set-off or apply (A) the Reserve Account and any and all proceeds of Receivables and other Collateral then in Buyer's possession, and/or (B) any indebtedness or other liability or obligation at any time owing by Buyer to or for the credit or the account of Seller, to Buyer's obligation to repurchase Purchased Receivables and to Seller's payment of the Obligations then owing by Seller to Buyer hereunder, and (v) Buyer shall withhold any further payments to Seller until Seller has paid to Buyer, or Buyer has finally and indefeasibly received all amounts due with respect to Purchased Receivables required to be repurchased by Seller, and all Obligations have been finally and indefeasibly paid to Buyer in cash and performed in full, and (vi) Buyer may take all other and further actions and avail itself of any and all rights, remedies, powers, benefits or privileges available to Buyer under this Agreement, under any Factoring Document, under any other agreement between Buyer and Seller or between Buyer and any other Person, as a Secured Party pursuant to the UCC, and available under law or in equity

*9.3. No Notice or Waiver.* SELLER WAIVES ANY REQUIREMENT THAT BUYER INFORM SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF BUYER'S RIGHT TO REQUIRE SELLER TO REPURCHASE ALL OUTSTANDING PURCHASED RECEIVABLES OR ANY ACCELERATION OF SELLER'S OBLIGATIONS HEREUNDER IN CONNECTION WITH ANY EVENT OF DEFAULT. FURTHER, BUYER'S FAILURE TO CHARGE OR ACCRUE FEES OR DISCOUNTS AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY BUYER OF ITS CLAIM THERETO.

**10. Term Termination; Release of Liens.**

*10.1.* *Initial Term; Renewal Terms.* This Agreement shall be effective on the Effective Date, and unless earlier terminated pursuant to the terms hereof (including but not limited to **Section 10.2**, below) shall have an initial term equal to the "Initial Term" described in **Item 20** of the **Schedule of Additional Terms**, and shall be automatically extended for a period equal to each "Renewal Term" described in **Item 21** of the **Schedule of Additional Terms** (each such period of extension, a "***Renewal Term***") unless Seller or Buyer provides written notice to the other party at least thirty (30) calendar days prior to the end of the Initial Term or a Renewal Term, as applicable, of its intention to terminate this Agreement on the end of the Initial Term or such Renewal Term (a "***Notice of Scheduled Termination***"). The period commencing on the Effective Date of this Agreement and continuing until the earlier of (a) the end of the Initial Term, as extended by and together with any Renewal Periods, (b) the earlier termination of this Agreement pursuant to the terms hereof, and (c) the date of a Seller Early Termination, shall be referred to as the "***Term***" of this Agreement. Following the end of the Term of this Agreement (i) all obligations of the parties with respect to any Purchased Receivables previously sold, assigned or transferred to Buyer under this Agreement shall remain in full force and effect until the same have been fully paid to Buyer in cash, together with the full payment in cash to Buyer of all Obligations, fees, costs and expenses payable by Seller to Buyer under this Agreement, and (ii) Buyer shall have no obligation to purchase any Receivables from Seller.

*10.2.* *Termination for Funding Failure.* In addition to Seller's rights to terminate this Agreement pursuant to the provisions of **Section 10.1** of this Agreement (a) in the event (i) Seller has generated Eligible Receivables with an average Gross Amount or Net Amount, as applicable, in excess of the Purchased Receivable Limit during any thirty (30) consecutive day period (the amount of such excess, a "***Permanent Eligible Receivable Increase***"), and (ii) Seller requests Buyer to increase the Purchased Receivable Limit in amount up to such Permanent Eligible Receivable Increase, and (iii) such Permanent Eligible Receivable Increase is maintained during the Buyer Receivable Increase Period (as defined below), and (iv)Buyer fails to increase the Purchased Receivable Limit by an amount at least equal to such Permanent Eligible Receivable Increase within thirty (30) calendar days of the receipt of such request (the "***Buyer Receivable Increase Period***"), then (b) upon expiration of the Buyer Receivable Increase Period Seller may terminate this Agreement upon thirty (30) calendar days written notice to Buyer, and Seller shall be required to repurchase the then-unpaid and outstanding Purchased Receivables from Buyer Seller to repurchase all Purchased Receivables at a price for each such Purchased Receivable equal to (A) the unpaid portion of the Initial Payment made by Buyer thereon, plus (B) the Variable Discount then owing thereon, plus (C) all outstanding Obligations and all fees, costs and expenses due and payable to Buyer pursuant to the terms of this Agreement; *provided, however*, in the event of Seller's termination of this Agreement pursuant to this **Section 10.2**, payment of the Early Termination Fee (if applicable) shall be waived by Buyer.

*10.3.* *No Lien Termination without Release.* Notwithstanding the termination of this Agreement, the repurchase of all outstanding Purchased Receivables by Seller, and the payment of all Obligations payable by Seller to Buyer pursuant to the terms hereof, Buyer shall not be required to release or discharge, or record or file any financing statement termination or any other instrument or evidence of a discharge or satisfaction of Seller's liens, Security Interest or Encumbrances on the Collateral, and Seller shall not be authorized or empowered to record or file any financing statement termination or any other instrument or evidence of a discharge or satisfaction of Buyer's liens, Security Interest or Encumbrances on the Collateral, unless and until Seller and each guarantor of Seller's Obligations deliver to Seller a fully executed and enforceable general release of claims against Buyer and the Indemnified Parties in form and content acceptable to Buyer in Buyer's sole discretion (the "***Termination Release***").

**11. General Provisions.**

*11.1.* *Governing Law; Jurisdiction; No Jury Trial.* All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdiction other than the State of New York. EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE

JURISDICTION OF THE STATE AND FEDERAL COURTS SITTING IN ERIE COUNTY, NEW YORK FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR WITH ANY TRANSACTION CONTEMPLATED HEREBY OR DISCUSSED HEREIN, AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT IN ANY SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF ANY SUCH COURT, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.

*11.2. Rights and Remedies Cumulative.* Buyer's rights, remedies, powers, benefits or privileges under this Agreement shall be cumulative and not alternative or exclusive, irrespective of any other rights, remedies, powers, benefits or privileges that may be available to Buyer under any other agreement, document or instrument by or between Seller and Buyer, or between Buyer and any other Person, by operation of law or otherwise, and may be exercised by Buyer at such time or times and in such order as Buyer in Buyer's sole discretion may determine, and are for the sole benefit of Buyer. Buyer's failure to exercise or delay in exercising any right, remedy, power, benefit or privilege shall not (a) preclude Buyer from exercising such right, remedy, power, benefit or privilege thereafter, (b) preclude Buyer from exercising any other right, remedy, power, benefit or privilege of Buyer, or (c) result in liability to Buyer or Buyer's affiliates or their respective members, managers, shareholders, directors, officers, partners, employees, consultants or agents.

*11.3. Reinstatement.*

11.3(a) Buyer's rights, remedies, powers, benefits or privileges under this Agreement, and the agreements, covenants, liabilities and obligations of Seller set forth in this Agreement (including, but not limited to, the final and indefeasible payment to Buyer of an aggregate amount equal to the repurchase price of the outstanding Purchased Receivables and the Obligations of Seller to Buyer in cash and performance of the Obligations in full, and all Security Interests, liens, charges and other Encumbrances granted to Buyer under this Agreement and each other agreement, document or instrument delivered by Seller or any other Person to Buyer), shall continue to be effective, or be reinstated, as the case may be, if at any time any payment in respect of the repurchase of Purchased Receivables by Buyer or payment of the Obligations of Seller to Buyer hereunder or proceeds of any collection action or other enforcement action by Buyer is subsequently invalidated, rescinded, declared to be fraudulent or preferential, set aside, recovered from, or disgorged by Buyer, or is or are required to be returned, refunded, repaid or otherwise restored to Seller, a trustee, receiver or any other Person by reason of any bankruptcy, reorganization, arrangement, composition or similar proceeding, or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Seller or any other Person, or for or with respect to any property of Seller or any other Person, under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), or otherwise, all as though such payment had not been made.

11.3(b) Furthermore to the extent that Seller or any other Person makes a payment or payments to Buyer with respect to the repurchase of Purchased Receivables or the Obligations payable to Buyer hereunder, or Buyer enforces or forecloses on (as the case may be) any right, remedy, power, benefit or privilege, Security Interest, lien, charge or other Encumbrance, or exercises any right of setoff, granted to Buyer under this Agreement or any other agreement, document or instrument delivered to Buyer in connection herewith, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, rescinded, declared to be fraudulent or preferential, set aside, recovered from, or disgorged by Buyer, or is or are required to be returned, refunded, repaid or otherwise restored to Seller, a

trustee, receiver or any other Person by reason of any bankruptcy, reorganization, arrangement, composition or similar proceeding, or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Seller or any other Person, or for or with respect to any property of Seller or any other Person, under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then, to the extent of such recovery, repurchase of Purchased Receivables and/or the Obligations or part thereof originally intended to be satisfied, or remaining unpaid, as applicable, and all rights, remedies, powers, benefits or privileges, Security Interests, liens, charges and other Encumbrances, granted to Buyer under this Agreement, under any other agreement, document or instrument delivered to Buyer in connection herewith, and under any applicable law, shall be revived and continued in full force and effect (x) as if such payment or payments had not been made or such enforcement or setoff had not occurred, and/or (y) until such payment or payments have been paid to Buyer in cash in full..

*11.4. Successors and Assigns.* This Agreement is entered into for the benefit of the parties hereto and their successors and assigns and shall be binding upon the parties, their successors and assigns. Buyer shall have the right, without the necessity of any consent, authorization or other action by Seller, to sell, assign, securitize or grant participations in all or a portion of Buyer's interest in the Purchased Receivables and the transactions described herein to other financing parties and/or financial institutions of Buyer's choice and on such terms as are acceptable to Buyer in Buyer's sole discretion. Seller shall not assign, exchange or otherwise hypothecate any rights, liabilities or obligations under this Agreement, in whole or in part, without the prior written consent of Buyer, which consent may be granted or withheld in Buyer's sole discretion, and any attempted assignment, exchange or hypothecation without Buyer's written consent shall be void and be of no effect.

*11.5. Marketing and Advertising.* With Seller's prior consent, which consent shall not be unreasonably withheld or delayed, Seller shall permit Buyer and Buyer's Affiliates to use the legal or fictional company name, logo, trademark and/or personal quotes in connection with promotional materials that Buyer may disseminate to the public relating to Buyer's relationship with Seller. Promotional materials may include, but are not limited to, brochures, video tapes, emails, internet websites, advertising in newspapers and/or other periodicals, lucites, pictures and photographs. Buyer shall provide Seller for Seller's review and consent, which consent shall not be unreasonably withheld or delayed, with a copy of promotional materials prepared by Buyer or Buyer's Affiliates prior to making such promotional materials available to the public.

*11.6. Headings.* The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

*11.7. Severability.* If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

*11.8. Notice.* Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided, confirmation of transmission is mechanically or electronically generated and kept on file by the sending party) or e-mail (provided, confirmation of receipt is verified by return email from the receiver or by other written means); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. All notices shall be delivered to a party's address as identified in **Item 22** of the **Schedule of Additional Terms**.

*11.9. Strict Performance.* The failure or delay by Buyer at any time to require Seller's strict compliance with or performance of any provision of this Agreement shall not waive, affect, impair or diminish any right of Buyer thereafter to demand Seller's strict compliance with and performance of such provision. Any suspension or waiver by Buyer of any Event of Default shall not suspend, waive or affect any other Event of Default, whether the same is prior or subsequent to such suspension or waiver and whether of the same or a different type. No failure or delay on the part of Buyer in the exercise of any right, remedy, power, benefit or privilege of Buyer hereunder or under any of the other agreements, documents or instruments delivered to Buyer in connection herewith shall operate as a waiver thereof, nor shall any single or partial exercise of any such

right, remedy, power, benefit or privilege preclude other or further exercise thereof or of any other right, remedy, power, benefit or privilege.

*11.10.* *Construction of Agreement.* The parties hereto agree that the terms, provisions and language of this Agreement were the result of negotiations between the parties, and, as a result, there shall be no presumption that any ambiguities in this Agreement shall be resolved against either party. Any controversy over the construction of this Agreement shall be decided without regard to events of authorship or negotiation.

*11.11.* *Buyer's Performance.* Buyer shall not be responsible for any failure of any Initial Payment, Residual Payment or payment of any other amount by Buyer to Seller pursuant to the terms of this Agreement to be credited to any account of Seller (i) if such failure is caused by conditions beyond Buyer's control including, but not limited to Acts of God, restrictions of Governmental Units (including the denial or cancellation of any necessary license, registration or permit), wars, insurrections, or interruptions of telephone service or internet access caused by a service provider or resulting from the failure of a service provider's equipment, software or personnel, and (ii) if such failure is not caused by or due to an event, occurrence or condition described in clause (i) immediately above, unless such failure is caused by or due to Buyer's gross negligence or willful misconduct.

*11.12.* *Entire Agreement; Amendments; Buyer's Consent.* This Agreement (including the Schedules and Exhibits hereto) constitutes the entire agreement between Buyer and Seller with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements or conditions between Buyer and Seller, whether express or implied, oral or written, with respect to the subject matter hereof. The Schedules and Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof. No amendment or waiver of any provision of this Agreement, nor consent to any departure by Seller therefrom, shall in any event be effective unless the same shall be Authenticated by Buyer in a Record, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

*11.13.* *Execution in Counterparts.* This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party. Any electronic signature to this Agreement (including any signature embedded in portable document format (.pdf) of this Agreement, delivered by facsimile, or electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record) shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*[SIGNATURE PAGE IMMEDIATELY FOLLOWS]*

IN WITNESS WHEREOF, each party has caused its signature to this Agreement to be duly executed as of the date first written above.

**SELLER**:

PINNACLE MINDS, INC.

By: *Mike Anthony*

Name: Mike Anthony

Its: CEO

**BUYER**:

CULAIN CAPITAL FUNDING LLC

By: *Joseph A. Heim*

Name: Joseph Heim

Its: Chief Credit Officer

**SCHEDULE OF ADDITIONAL TERMS**

Item 1. Purchased Receivable Limit. Means, at any time, Ten Million and 00/100 Dollars ($10,000,000.00), plus the amount of each increase of the Purchase Receivable Limit made pursuant to **Section 3.2**.

Item 2. Overadvance Fee. N/A.

Item 3. Additional Ineligible Receivable Criteria. In addition to the criteria for treating any Receivable as an Ineligible Receivable described in the definition of "Ineligible Receivables" contained in the **Definitions Schedule**, without limiting Buyer's discretion to purchase or refrain from purchasing any Receivable as described in **Section 2.1**, Buyer may treat any Receivable as an Ineligible Receivable if:

- Such Receivable provides for payment terms in excess of ten (10) calendar days after the Customer or Account Debtor's receipt of funds from the IRS representing payment of such Customer's or Account Debtor's ERC Credit, unless otherwise agreed to in writing in advance by Buyer; or
- The face amount of such Receivable, or Receivables, arising from a sale or sales to a single Customer or Account Debtor, exceed or exceeds, in the aggregate, at any time, an amount equal to lesser of (i) fifteen percent (15.0%) of the aggregate unpaid amount of Purchased Receivables from all Customers and Account Debtors outstanding at such time, or (ii) One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00); or
- Such Purchased Receivable is in the amount, and remains unpaid, in whole or in part, for more than the specific number of calendar days after the date of the invoice relating to such Purchased Receivable, as provided in the following table:

| **ERC Credit Amount** | **Days after Invoice Date** |
|---|---|
| Less than Two Hundred Fifty Thousand ($250,000.00) | 150 days |
| Greater than or equal to Two Hundred Fifty Thousand ($250,000.00) and less than One Million ($1,000,000.00) | 210 days |
| Greater than or equal to One Million ($1,000,000.00) and less than Three Million ($3,000,000.00) | 270 days |
| Greater than or equal to Three Million ($3,000,000.00) | 400 days |

Item 4. Collateral. Means all of the Seller's right, title and interest in, to and under: all of Seller's Accounts and Receivables (whether or not sold to Buyer hereunder); all past, present and future Customer contracts, lists, agreements, or arrangements relating thereto; all rights to payments under any related Contracts, contract rights, Instruments, Documents, Chattel Paper, General Intangibles, or other agreements with all Customers and Account Debtors; all Collections, Records and Proceeds thereof; any other obligations or rights of Seller to receive any payments in money or kind from any and all Customers and Account Debtors; all cash and non-cash Proceeds of the foregoing; and all books and records pertaining to any of the foregoing (including but not limited all to all tangible books and records, and all recorded data of any kind or nature, regardless of the medium of recording, including, without limitation, writings, plans, specifications, schematics Customer lists, credit files, computer programs, printouts and other computer materials and records of Seller pertaining to any of the items or subject matter described in this **Item 4**).

Item 5. Funding Request Additional Information. N/A

Item 6. Funding Request Deadline. Means 10 a.m. Eastern Time on a Business Day.

Item 7. Initial Payment Rate. Means sixty five percent (65.00%) of the lesser of the Gross Amount or Net Amount of a Purchased Receivable.

Item 8. Fixed Discount. Means an amount equal to one and three tenths percent (1.30%) of the Gross Amount or Net Amount of a Purchased Receivable, as applicable, used to determine the Initial Payment with

respect to such Purchased Receivable, which Fixed Discount shall apply to the Purchased Receivable during the Fixed Discount Period.

Item 9. Fixed Discount Period. Means, with respect to a Purchased Receivable, the one hundred eighty (180) consecutive calendar day period following the date of the Initial Payment with respect to such Purchased Receivable (the "***Initial Payment Date***") consisting of (i) the thirty (30) consecutive calendar day period commencing on the Initial Payment Date with respect to such Purchased Receivable, during which period the Fixed Discount shall be calculated and applied on a monthly basis, and (ii) the period commencing on the thirty first (31st) calendar day after the Initial Payment Date with respect to such Purchased Receivable and ending on the one hundred fiftieth (150th) consecutive calendar day after the Initial Payment Date with respect to such Purchased Receivable, during which period the Fixed Discount shall be calculated and applied on a daily percentage rate equal to 0.0417 percent (0.000417) for each calendar day during such period in which a Purchased Receivable remains unpaid, in whole or in part.

Item 10. Variable Discount. Means an amount equal to the Gross Amount or Net Amount of a Purchased Receivable, as applicable, used to determine the Initial Payment with respect to such Purchased Receivable, multiplied by a daily percentage rate equal to 0.05833 percent (0.0005833), commencing on the first (1st) calendar day after the end of the Fixed Discount Period with respect to such Purchased Receivable, and continuing for each calendar day in which a Purchased Receivable remains unpaid, in whole or in part, and ending on the Payment Credit Date for deposit of Collections for such Purchased Receivable in an aggregate amount equal to the Gross Amount or Net Amount of such Purchased Receivable, as applicable, used to determine the Initial Payment with respect to such Purchased Receivable. The Variable Discount shall continue to be charged on the amount of any Collections credited to the payment of any Purchased Receivable until the Payment Credit Date with respect to such Collections. Within two (2) Business Days of collection of a Purchased Receivable in full that was assessed interest by Seller pursuant to Seller's agreement with such Customer or Account Debtor, Buyer will remit fifty percent (50.0%) of such interest amount to Seller.

Item 11. Purchased Receivable Approval Period. Means the five (5) consecutive Business Day period commencing on the date the invoice upon which a Purchased Receivable is based is delivered to Buyer in a Funding Request.

Item 12. Concentration Limit. At any time, the lesser of (i) fifteen percent (15.0%) of the aggregate unpaid amount of Purchased Receivables from all Customers and Account Debtors outstanding at such time, or (ii) One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00).

Item 13. Additional Repurchase Events. In addition to the events and conditions described in **Section 5.1** of this Agreement, upon the occurrence of any of the following events or conditions the Buyer shall have the right to require Seller to repurchase or replace, or otherwise take any right, remedy, power, benefit or privilege of Buyer with respect to any Purchased Receivable pursuant to the terms of **Section 5.1** of the Agreement:

- If Seller is required to reduce the amount of any invoice relating to a Purchased Receivable after the issuance thereof due to Seller's error or miscalculation of the fee payable by such Customer or Account Debtor.

Item 14. Lockbox Information. Seller shall instruct Account Debtors on Seller's invoices to forward all checks and other tangible Collections to the following Lockbox:

PINNACLE MINDS, INC. DBA SMART ERC
PO BOX 74421
CLEVELAND OH 44194-0002

Item 15. Collection Account Information. Seller shall instruct Account Debtors on Seller's invoices to forward all ACH, wire transfers, and other electronic Collections to the following Collection Account:

| | |
|---|---|
| Beneficiary Bank Name: | KEYBANK, NATIONAL ASSOCIATION<br>4910 TIEDEMAN ROAD<br>BROOKLYN OH 44144 |
| Bank ABA: | 021300077 |
| Bank SWIFT: | KEYBUS33 |
| Beneficiary Name: | CULAIN CAPITAL FUNDING LLC |
| Beneficiary Address: | 1780 WEHRLE DRIVE, SUITE 101<br>BUFFALO, NY 14221 |
| Beneficiary Account No.: | 329681394865 |

Item 16. Misdirected Payment Fee. Means an amount equal to two and one-half percent (2.5%) of the amount of any payment on account of a Purchased Receivable that has been received by Seller and not delivered in kind to Buyer within two (2) Business Day(s) following the date of receipt by Seller.

Item 17. Misdirected Payment Waiver Period. Means the thirty (30) consecutive calendar day period commencing on the Effective Date of this Agreement.

Item 18. Additional Fees and Expenses. In addition to all other fees, costs and expenses to be paid by Seller or reimbursed by Seller to Buyer as described in this Agreement, Buyer shall pay the following fees, costs and expenses as follows:

- Closing Fee. Means a fee payable to Buyer upon Seller's execution of this Agreement in an amount equal to Eighty Thousand and 00/100 Dollars ($80,000.00). In the event the Purchased Receivable Limit is increased from time to time during the Term of this Agreement, Seller shall pay to Buyer an amount equal to one percent (1.00%) of the amount of each such increase upon the effective date of such increase.

- Early Termination Fee. Means, in the event of an uncured Event of Default resulting in the termination of this Agreement or the termination of this Agreement due to a Seller Early Termination, a fee to be paid by Seller to the Buyer in an amount equal to (i) five percent (5.0%) of the Purchased Receivable Limit if such termination or Seller Early Termination occurs during the twelve (12) calendar month period commencing on the Effective Date, and (ii) four percent (4.0%) of the Purchased Receivable Limit if such termination or Seller Early Termination occurs after the period described in clause (i) immediately above, and prior to the end of the Initial Term.

Buyer and Seller each hereby acknowledges and agrees that it would be impractical and extremely difficult to ascertain Buyer's actual damages from the early termination of the factoring facility described in this Agreement (the "***Factoring Facility***"), and that the above early termination fee has been arrived at by mutual agreement of Buyer and Seller as to a reasonable calculation of Lender's lost profits as a result of early termination of the Factoring Facility. Buyer and Seller each further hereby acknowledges and agrees that the early termination fee provided for above is intended to be a fair and reasonable approximation of Buyer's actual damages from early termination of the Factoring Facility, are presumed to be the amount of damages sustained by Buyer as a result of such early termination, are reasonable under the circumstances currently existing, and that the early termination fee consists of liquidated damages of the Buyer and are not intended to be penalties.

Notwithstanding anything to the contrary contained in this Agreement, in the event the Factoring Facility is terminated, amended, restated, extended or otherwise modified in connection with Buyer's exercise of its right of first refusal and related refinancing of this Agreement by Buyer pursuant to the provisions of **Section 8.5** of this Agreement, payment of the Early Termination Fee (if applicable) shall be waived by Buyer.

- Missing Notation Fee. A fee equal to one half of one percent (0.05%) of the Gross Amount of any Purchased Receivable if the related invoice is sent by Seller to a Customer or an Account Debtor which does not provide for payment to the Lockbox, and/or to the Collection Account as required by the terms of this Agreement.

- Inspection/Field Examination Expenses. In connection with Buyer's exercise of its rights under **Section 6.5** of this Agreement Seller shall be liable for and promptly reimburse Buyer for all fees, costs and expenses associated with periodic field examinations and inspections of Buyer's books and records, the Receivables and/or other Collateral performed by Buyer and/or Buyer's agents, all as deemed necessary by Buyer in its reasonable discretion. Prior to the occurrence of an Event of Default in no event shall Seller be liable for or reimburse Buyer for such fees, costs or expenses to the extent Buyer performs more than four (4) field examinations or inspections in any calendar year. Seller acknowledges and agrees that following an Event of Default Seller shall be liable for and shall reimburse Buyer for all fees, costs and expenses of all field examinations and inspections conducted by Buyer and/or its agents, without limit and regardless of the number of field examinations or inspections conducted by Buyer or its agents in any calendar year.

Item 19. Financial Statements and Tax Returns.

- Monthly Financial Statements. Within twenty (20) calendar days after the end of each calendar month financial statements consisting of balance sheets, statements of operations and retained earnings and statements of cash flow, prepared by management of Seller as of and for the end of such calendar month in accordance with GAAP (except for the absence of footnotes).
- Quarterly Financial Statements. Within forty five (45) calendar days after the end of each fiscal quarter of Seller financial statements consisting of balance sheets, statements of operations and retained earnings and statements of cash flow, prepared by management of Seller as of and for the end of such fiscal quarter in accordance with GAAP (except for the absence of footnotes).
- Annual Financial Statements and Tax Returns. Within (i) sixty (60) calendar days after the close of each fiscal year of Seller a copy of audited annual financial statements of Seller prepared by an independent certified public accountant in accordance with GAAP consisting of a balance sheet, statements of operations and retained earnings, statements of cash flow; and if Seller's independent certified public accountant has prepared footnotes to accompany any such financial statements, Seller shall deliver such footnotes to Buyer contemporaneously with Seller's delivery of the associated financial statements to Buyer, and (ii) one hundred fifty (150) calendar days of the end of each fiscal year of Seller copies of Seller's federal and state tax returns.

Item 20. Initial Term. The twenty four (24) consecutive month period commencing on the Effective Date of this Agreement.

Item 21. Renewal Term; Renewal Terms. A period of six (6) consecutive months commencing immediately after the end of the Initial Term, or a Renewal Term, as applicable.

Item 22. Notice Address:

If to Buyer:

Culain Capital Funding LLC
1780 Wehrle Drive
Suite 101
Williamsville, NY 14221
Attn: Joseph A. Heim, Chief Credit Officer
Tel: (716) 919-1322
Email: jheim@culaincapital.com

If to Seller:

Pinnacle Minds, Inc.
350 N. Lantana St.
Suite 229
Camarillo, CA 93010

Attn: Maged Kerolos, CEO
Tel: (805) 892-6183
Email: mike@smarterc.com

## DEFINITIONS SCHEDULE

"***Business Day***" means a day of the week other than a Saturday, Sunday, or a holiday under which banks located in the State of New York or New Jersey are required or permitted to be closed.

"***Client Portal***" is defined in **Section 2.2**.

"***Collateral***" means the property of Seller securing Seller's Obligations under this Agreement for the payment of fees, costs, expenses and all other amounts payable to Buyer pursuant to the terms of this Agreement, and is further defined in **Item 4** of the **Schedule of Additional Terms**.

"***Collections***" means: all checks, drafts, notes, acceptances, cashier's checks, bank checks, payment orders or other tangible forms of payment in payment of a Receivable; all ACH credit entries, wire transfers, other acceptable forms of electronic payment or other forms of cash payment made in payment of a Receivable; all Proceeds of all Letters of Credit securing a Receivable; all insurance claims and all other amounts payable in respect of a Receivable; and, all Proceeds of Collateral deposited in the Collection Account or the Settlement Account or otherwise received by Buyer.

"***Concentration Limit***" means the Concentration Limit as described in **Item 12** of the **Schedule of Additional Terms**.

"***Credit Limit***" means, with respect to a Customer or Account Debtor, the maximum amount of uncollected Purchased Receivables established by Buyer for such Customer or Account Debtor from time to time in Buyer's sole discretion. Any Credit Limit established for a Customer or an Account Debtor's will be displayed in the Client Portal.

"***Customer***" means Seller's customer to whom Seller provides goods and/or services that serves as the basis for a Receivable.

"***Disputed Receivable***" means any Receivable that on the date of when tendered to Buyer for sale is, or any Purchased Receivable that becomes, subject to any claim by a Customer or Account Debtor against Seller, of any kind whatsoever, valid or invalid, that may reduce the amount collectible from such Customer or Account Debtor in respect of such Receivable, including any dispute or claim, *bona fide* or otherwise, as to price, terms, quantity, quality, delivery, or any cause or defense to payment of such Receivable whatsoever, and shall also include any Purchased Receivable (i) that has not been approved by the respective Customer or Account Debtor, or has not been verified or confirmed by Buyer to Buyer's reasonable satisfaction, by the end of the Purchased Receivable Approval Period, (ii) that has not paid to Buyer in full by the Presumed Dispute Date, (iii) with respect to which Seller is required to reduce the amount of the invoice relating to such Purchased Receivable after the issuance thereof due to Seller's error or miscalculation of the fee payable by such Customer or Account Debtor, or (iv) with respect to which Seller is required to reduce the amount of any invoice relating to such Purchased Receivable after the issuance thereof due to a reduction by the Internal Revenue Service of the amount of the ERC Credits payable to such Customer or Account Debtor as calculated by Seller. Buyer shall be under no obligation to determine or verify the *bona fides* or veracity of any claim, dispute or other allegation of a Customer, Account Debtor or Seller with respect to a Disputed Receivable.

"***Eligible Receivable***" means a Receivable arising out of a sale in the ordinary course of Seller's business in respect of which all of the representations and warranties set forth in this Agreement with respect to Eligible Receivables are true and accurate on the date of offer to Buyer, and for each day thereafter until paid in full, and that is acceptable to Buyer in Buyer's sole discretion.

"***ERC Credits***" means employee retention credits available to eligible employers under the Coronavirus Aid Relief and Economic Security Act (the "CARES Act").

"***Factoring Documents***" means, collectively, this Agreement and all other agreements, documents and instruments executed and/or delivered to Buyer in connection with the transactions contemplated by this Agreement, including but not limited to all guarantees, validity agreements, resolutions and other items, as

each of the foregoing may be amended, restated, extended, supplemented or otherwise modified from time to time.

"***Fixed Discount***" means the initial discount payable to Buyer with respect to a Purchased Receivable as described in **Section 4.4**, as supplemented by **Item 8** of the **Schedule of Additional Terms**.

"***Fixed Discount Period***" means the period during which the Fixed Discount shall apply while a Purchased Receivable shall remain unpaid, in whole or in part, as described in **Item 9** of the **Schedule of Additional Terms**.

"***Ineligible Receivable***" means any Receivable which Buyer determines is not an Eligible Receivable in Buyer's sole discretion, including but not limited to:

- Any Receivable with respect to which the Customer or Account Debtor is an Affiliate of Seller or a director, officer, agent, stockholder, or employee of Seller's or any of Seller's Affiliates; and
- Any Receivable which on the date of tender to Buyer is, or that any time prior to the full payment thereof becomes, a Disputed Receivable or with respect to which there is any dispute with the respective Customer or Account Debtor;
- Any Receivable with respect to which the Customer or Account Debtor is a person to which Seller is indebted, *provided, however*, that in Buyer's sole discretion any such Receivable may be treated as an Ineligible Receivable as to that portion of such Receivable which is less than or equal to the amount owed by Seller to such Person;
- Any Receivable which has been charged back to or repurchased by Seller pursuant to the terms of this Agreement;
- Any Receivable with respect to which the goods or services covered by the invoice relating to such Receivable were shipped to the Customer or Account Debtor or performed for the Customer or Account Debtor, as applicable, materially prior to, or at any time after, the date of the invoice giving rise to such Receivable;
- Any Receivable that consists of a sale to a Customer or Account Debtor: on consignment; on any bill and hold basis; on any guaranteed sale, sale or return, sale on approval or other repurchase or return basis; on any billing in advance of shipment or other "pre-billing" basis; or under any payment plan, scheduled installment plan, or other extended payment terms basis;
- Any Receivable that is invoiced in any currency other than United States Dollars;
- If, other than as permitted pursuant to **Section 6.1(b)**, the invoice relating to such Receivable fails to set forth, as the sole authorized instructions for payment, the address of the "Lockbox", the "Collection Account", or such other address or account as may be communicated by Buyer to Seller from time to time;
- Any Receivable related to the permanent placement of a temporary employee without confirmation of employee start date;
- Any Receivable (or any portion thereof) consisting of amounts owing for finance or service charges;
- Any Receivable offset by contra accounts (including customer deposits, etc.);
- Any Receivable issued for future performance (including installations, periodic servicing, etc.);
- Any Receivable for sales and services under warranty agreements or arrangements to be supplied in the future;
- Any Receivable for guaranteed sales;
- Any Receivable from any Customer or Account Debtor that had its check or other payment on a Purchased Receivable returned unpaid;
- Any Receivable from any Customer or Account Debtor that had a Purchased Receivable submitted for collection;

- Any Receivable from any Customer or Account Debtor that had a claim denied for payment of a Purchased Receivable under a credit insurance policy, or any Receivable for which Buyer is not able to purchase credit insurance from Buyer's credit insurance carrier in such coverage amount and upon such terms as are reasonably satisfactory to Buyer;
- Any Receivable for which Buyer's Security Interest has not been perfected; and
- Any Receivable treated as an Ineligible Receivable pursuant to the additional criteria described in **Item 3** of the **Schedule of Additional Terms**.

"***Initial Payment***" means the initial amount paid by Buyer for a Purchased Receivable as described in **Article 4** of this Agreement as supplemented by **Item 7** of the **Schedule of Additional Terms**.

"***Initial Term***" means the initial term of this Agreement as provided in **Section 10.1** of this Agreement and as further described in **Item 20** of the **Schedule of Additional Terms**.

"***Insolvency Claim***" means, if Seller has not breached its representations with respect to the solvency, bankruptcy or financial inability to pay of any Customer or Account Debtor contained in **Paragraph 8.1(a)** as of the date of sale of such Purchased Receivable to Buyer, any defense or other claim by an Account Debtor to payment with respect to a Purchased Receivable sold to Buyer hereunder arising solely out of (a) the commencement of and continuation of any case by or against such Account Debtor under any provision of the United States Bankruptcy Code, or under any federal, state, local or other applicable law including provisions for reorganizations or liquidations, (b) the appointment of and continuing representation by a receiver, trustee or similar officer for such Account Debtor under any provision of the United States Bankruptcy Code, or under any federal, state, local or other applicable law including provisions for reorganizations or liquidations, (c) such Account Debtor making an assignment for the benefit of its creditors, (d) such Account Debtor calling a meeting of its creditors to obtain any general financial accommodation, (e) such Account Debtor's suspension of its business as demonstrated to the reasonable satisfaction of Buyer, or (f) the Account Debtor's insolvency or other financial inability pay such Purchased Receivable as demonstrated to the reasonable satisfaction of Buyer.

"***Lockbox Restart Date***" is defined in **Section 6.1(b)** of this Agreement.

"***Lockbox Suspension Date***" is defined in **Section 6.1(b)** of this Agreement.

"***Material Eligible Receivable***" means each Eligible Receivable in a Gross Amount or Net Amount, as applicable equal to exceeding One Hundred Thousand and 00/Dollars ($100,000.00).

"***Misdirected Payment Fee***" means the fee chargeable to Seller's account in connection with any Collections with respect to a Purchased Receivable received by Seller which is not delivered to Buyer within such time as described in **Item 16** of the **Schedule of Additional Terms**.

"***Misdirected Payment Waiver Period***" means the period during which the Misdirected Payment Fee shall not apply to any payments on any Purchased Receivables that are not made to the Lockbox or the Collection Account, as provided in **Paragraph 4.5(a)**, as supplemented by **Item 17** of the **Schedule of Additional Terms**.

"***Notice of Assignment***" is defined in **Section 6.4** of this Agreement.

"***Obligations***" is defined in **Section 7.1** if this Agreement.

"***Payment Credit Date***" means the date a payment of Collections with respect to a Purchased Receivable is credited to the account of Buyer for purposes of determining the Variable Discount as follows:

(a) If received by wire transfer: the date of deposit into Buyer's Settlement Account plus one (1) Business Day;

(b) If received by ACH or other acceptable form of electronic payment: the date of deposit into Buyer's Settlement Account plus two (2) Business Days; and

(c) If received by check or other physical payment instrument: the date of deposit into Buyer's Settlement Account plus three (3) Business Days

"***Person***" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

"***Presumed Dispute Date***" means, with respect to a Purchased Receivable, the date that is the earlier of (i) twenty (20) calendar days after the Customer or Account Debtor's receipt of funds from the IRS representing payment of such Customer's or Account Debtor's ERC Credit, and (ii) the number of days provided for payment of such Purchased Receivable as described in the third (3rd) bullet point contained in **Item 3** of the **Schedule of Additional Terms**. For purposes of clarity, the Presumed Dispute Date is the date upon which such Purchased Receivable is presumed to be subject to a dispute between Seller and the related Customer or Account Debtor.

"***Purchased Receivable***" is defined in **Section 2.4** of this Agreement.

"***Purchased Receivable Approval Period***" is defined in **Item 11** of the **Schedule of Additional Terms**.

"***Purchased Receivable Limit***" means, at any time, the maximum aggregate outstanding face value of Eligible Receivables that Buyer is willing to purchase from Seller pursuant to the terms of this Agreement at such time, as indicated in **Item 1** of the **Schedule of Additional Terms**, and as may be modified pursuant to **Section 3.2** of this Agreement.

"***Receivable***" means, with respect to Seller, a right to payment of a monetary obligation, whether or not earned by performance (i) for goods or inventory that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered.

"***Renewal Term***" means each period of renewal of this Agreement following the Initial Term as provided in **Section 11.1** of this Agreement and as supplemented by **Item 21** of the **Schedule of Additional Terms**.

"***Reserve Account***" means the account established by Buyer for the payment of fees, costs and expenses payable to Buyer pursuant to the terms of this Agreement, for the payment of any Overadvance, and for the crediting of any Purchased Receivable that no longer is an Eligible Receivable pursuant to the terms of this Agreement, as further described in **Section 5.4** of this Agreement.

"***Residual Payment***" means the amount, if any, payable to Seller with respect to a Purchased Receivable after the Initial Payment has been made to Seller as described in **Article 4** of this Agreement as supplemented by **Item 8** and **Item 10** of the **Schedule of Additional Terms**.

"***Seller Early Termination***" means (i) a date on which Buyer receives a notice of termination of this Agreement from Seller other than a Notice of Scheduled Termination, or (ii) a date, other than the last day of the Initial Term or a Renewal Term, on which Seller repurchases all outstanding Purchased Receivables, pays all Variable Fees thereon, pays all other Obligations and provides a Termination Release to Buyer without notice or on notice other than a Notice of Scheduled Termination.

"***Settlement Account***" means Buyer's account at KeyBank N.A., Buffalo, NY 14221, Account Name: Culain Capital Funding Operating Account; Account No. 329681394840, or such other account as Buyer may advise Seller.

"***Term***" of this Agreement means the Initial Term together with each Renewal Term as provided in **Section 10.1** of this Agreement, as supplemented by **Item 20** and **Item 21** of the **Schedule of Additional Terms**.

"***Termination Release***" is defined in **Section 10.3** of this Agreement.

"***UCC***" means the New York Uniform Commercial Code as in effect on the date of this Agreement, and as may be amended or modified after the date of this Agreement; *provided, however*, in the event that, by reason of mandatory provisions of law, the rights of Buyer with respect to the collection of any Receivable or Account, or the perfection, the effect of perfection or nonperfection or priority of Buyer's Security Interest in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as enacted and in

effect in such other jurisdiction solely for the purposes of the provisions hereof relating to the rights of Buyer with respect to the collection of any Receivable or Account, or perfection, the effect of perfection or nonperfection or priority of Buyer's Security Interest in such Collateral.

"***Variable Discount***" means the discount payable to Buyer with respect to a Purchased Receivable relating to the number of calendar days such Purchased Receivable remains unpaid in full, as described in **Section 4.4**, as supplemented by Item 10 of the **Schedule of Additional Terms**.

***UCC Definitions***. When used in this Agreement:

(a) Article 9 Definitions. The following terms have the same definitions as provided in Section 9-102 of Article 9 of the UCC, but for convenience in this Agreement such terms are capitalized: "Accession"; "Account"; "Account Debtor" (and for purposes of this Agreement, to the extent not included in the UCC definition of Account Debtor, the term "Account Debtor" includes all Persons obligated, directly or indirectly, on any account receivable); "As-extracted Collateral"; "Authenticate" (and all derivations thereof); "Certificate of Title"; "Chattel Paper"; "Commercial Tort Claim"; "Commodity Account"; "Commodity Intermediary"; "Consumer Transaction"; "Debtor"; "Deposit Account"; "Document"; "Electronic Chattel Paper"; "Encumbrance"; "Equipment"; "Financing Statement"; "Fixtures" (and the singular "Fixture" may be used in this Agreement"); "General Intangible" (and for purposes of this Agreement, to the extent not included in the UCC definition of General Intangible, the term "General Intangible" includes all patents, patent applications, trademarks, trademark applications, copyrights, copyright applications, proprietary and intellectual property rights, labels, trade secrets, trade names, rights of use of any name, advertising matter, registrations, licenses, software, franchises, Customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, security deposits and rights to indemnification, and any property of a similar nature, all goodwill, and all rights, title and interests in and to all of the foregoing); "Goods"; "Governmental Unit"; "Health-care-insurance Receivable"; "Instrument"; "Inventory"; "Investment Property"; "Jurisdiction Of Organization"; "Letter-of-credit Right"; "Obligor"; "Payment Intangible"; "Person Related To"; "Proceeds" (as specifically defined in Section 9-102(a)(64) of the UCC); "Public Organic Record"; "Record" (and for purposes of this Agreement, to the extent not included in the UCC definition of Record, the term "Record" includes all recorded data of any kind or nature, regardless of the medium of recording, including, without limitation, writings, plans, specifications, schematics Customer lists, credit files, computer programs, printouts and other computer materials and records of a Person, wherever located and whether in the custody of such Person or in the custody another Person for their benefit); "Registered Organization"; "Secondary Obligor"; "Secured Party"; "Security Agreement"; "Software"; "State"; and "Supporting Obligation";

(b) Article 8 Definitions. The following terms have the same definitions as provided in Article 8 of the UCC (specifically including Section 8-102 and the provisions and principals of Section 8-103 of the UCC), but for convenience in this Agreement such terms are capitalized: "Financial Asset" (and the plural "Financial Assets" may be used in this Agreement"); "Securities Account"; "Securities Intermediary"; "Security" (and the plural "Securities" may be used in this Agreement"); and "Security Entitlement";

(c) Control. The term "Control" with respect to property or interests in property (i) has the same definition as "control" provided in Section 7-106 of the UCC when used in connection with an electronic Document of Title (as used in Article 7 of the UCC), (ii) has the same definition as "control" provided in Section 8-106 of the UCC when used in connection with Securities and Security Entitlements (and continue to be subject to the provisions of Article 9 of the UCC, including Sections 9-106 and 9-305 thereof), and (iii) has the same definition as "control" provided in Article 9 of the UCC (including Sections 9-104 through 9-107, inclusive, of the UCC) when used in connection with all other property;

(d) Money. The term "Money" has the same definition as "money" provided in Section 1-201(b)(24) of the UCC; and

(e) Security Interest. The term "Security Interest" has the same definition as "security interest" provided in Section 1-201(b)(35) of the UCC.

(f) Other UCC Definitions. Unless specifically provided for in this Agreement, if any of the capitalized terms contained in paragraphs (a) through (e) immediately above are defined in any other article, division, section or provision of the UCC, the definitions in paragraphs (a) through (e) immediately above shall apply for purposes of this Agreement.

**EXHIBIT A FORM OF PURCHASE OFFER**

[Month] [Date], [Year]

Culain Capital Funding LLC
1780 Wehrle Drive
Suite 101
Williamsville, NY 14221

***Re: Offer for Purchase of Receivables***

The undersigned requests that Culain Capital Funding LLC ("Buyer") purchase the Eligible Receivables (as defined in that certain Factoring Agreement dated April 20, 2023 between the undersigned, as Seller, and Buyer, as the same may be amended, restated, extended, supplemented or otherwise modified from time to time (the "Factoring Agreement") described in the attached Sale and Assignment of Account Receivable. Capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Factoring Agreement.

(A) Gross Amount of Eligible Receivables: $________________________________.

(B) Net Amount of Eligible Receivables: $________________________________.

(C) Initial Payment Rate: 65 percent (65.0%).

(D) Initial Payment Amount
(Lesser of A and B, multiplied by C): $________________________________.

Please call the undersigned to confirm receipt of this request at (____) _______ or by emailing confirmation to ________________________.

PINNACLE MINDS, INC.

By: _______________________________________

Name: ____________________________________

Title: _____________________________________

## EXHIBIT B FORM OF ASSIGNMENT AGREEMENT

## SALE AND ASSIGNMENT OF ACCOUNTS RECEIVABLE

FOR VALUE RECEIVED, **PINNACLE MINDS, INC.** (d/b/a Smart ERC; "***Seller***") hereby sells, assigns and transfers all right, title and interest in and to the account(s) receivable as described in the Schedule of Assigned Accounts annexed hereto, to **CULAIN CAPITAL FUNDING LLC** ("***Buyer***").

Seller warrants that the account(s) receivable annexed hereto are valid and due, and that Seller has not received payment for any or any part thereof. Seller further affirms that all representations and warranties contained in that certain Factoring Agreement between Seller and Buyer dated as of April 20, 2023 (the "***Factoring Agreement***") with respect to such account(s) receivable are true and accurate as of the date hereof, and that the assignment of such account(s) receivable are subject to the terms and conditions of the Factoring Agreement.

Dated this _______ day of _________, _____________.

PINNACLE MINDS, INC.

By:______________________________

Name:___________________________

Its:_______________________________

## EXHIBIT C FORM OF SCHEDULE OF ASSIGNED ACCOUNTS

| Invoice Number | Customer/Account Debtor | Invoice Date | Invoice Amount | Customer/Account Debtor Reference Number | Purchase Order Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

File format in Microsoft Excel (XLS) is preferable.