UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PINNACLE MINDS, INC.

Plaintiff,

vs.

CULAIN CAPITAL FUNDING LLC,

Defendant.

**DECLARATION OF TERRENCE GREINER**

Case No. 1:26-cv-00501-JLS

TERRENCE GREINER, declares the following:

1. I am the General Counsel and Executive Vice President of Culain Capital Management, LLC ("Culain"). Prior to joining Culain in 2024, I was outside counsel to the company. I make this declaration of my personal knowledge, unless otherwise stated.

2. In my role as outside counsel to Culain, and continuing with my role as General Counsel and Executive Vice President, I have been personally involved in all aspects of the business transaction between Culain and Pinnacle Minds, Inc. ("PMI").

3. I am an attorney at law duly licensed by the State of New York, having graduated from State University at Buffalo School of Law in 1987. I have been involved in commercial financing for my entire career, both as an attorney as well as in my role as a principal with Culain. My CV is attached as Exhibit 1.

4. As detailed in this declaration as well as the accompanying declarations of Joseph Heim and Timothy Sardinia, as well as Culain's memorandum of law, PMI's request for temporary relief, as well as its request for a preliminary injunction, and the other relief requested in its complaint ignores the plain language of the contract that governs this transaction, and more significantly, is based on a

fundamental misunderstanding (or worse, an intentional misstatement) of invoice factoring, and the invoice factoring agreement that governs this transaction.

5. PMI complains loudly about its perceived wrongs and asks the Court for remedies that are not available pursuant to the invoice factoring agreement. PMI's cash flow troubles are the product of its own actions and misdeeds as well as other factors that are related to its business model and which are outside of its invoice factoring relationship with Culain.

6. PMI demands the release of Culain's collections with respect to PMI's invoices.

7. PMI's moving papers ignore many important facts, including 1) that the funds that PMI demands have all been pledged as collateral against the more than $8 Million Dollars that Culain paid to PMI, 2) that PMI is in default under its factoring agreement with Culain, and 3) that the funds that PMI demands (i.e., Culain's collateral) are to be applied to the amounts owed by PMI.

8. To grant the relief that PMI is requesting, the Court would need to ignore the plain language of the factoring agreement.

9. This, coupled with the fact that PMI is (and for many months has been) in default of the contract governing this transaction requires that PMI's application for temporary and injunctive relief be denied.

**CULAIN CAPITAL MANAGEMENT, LLC**

10. Culain is a Williamsville, New York-based company that provides invoice factoring services.

11. Invoice factoring provides cash flow to companies that do not want to (or cannot) wait for their customers (the "account debtors") to pay their invoices. Typical factoring clients are unable to obtain traditional institutional financing such as lines of credit.

12. Invoice factoring provides an immediate infusion of cash against an invoice that may take weeks, months, or longer to be paid.

13. In its simplest form, invoice factoring involves the sale of an existing invoice to a third-party "factor" at a discount. If, and when the invoice is paid by the account debtor, the factor pays its client the difference between the paid invoice and any accrued fees.

14. The fee structure in a factoring transaction is not complicated, the longer an invoice remains unpaid, the larger the fee.

**PMI REQUESTS THAT CULAIN PROVIDE INVOICE FACTORING SERVICES AND ENTERS INTO INVOICE FACTORING AGREEMENT WITH CULAIN**

15. In early January, 2023, PMI, a California-based company (which does business as "Smart ERC") was introduced to Culain through a broker.

16. Culain was told that PMI's business included assistance to taxpayers to request post-Covid tax relief in the form of Employee Retention Tax Credits ("ERC") from the IRS.

17. PMI claimed to utilize the services of "expert" tax preparers, tax attorneys, and certified public accountants to assist taxpayers through the IRS application process. PMI would then invoice its clients, who become the account debtors.

18. PMI's invoices were contingent upon the taxpayer (account debtor) obtaining ERC funding from the IRS. PMI's invoices require the taxpayer (account debtor) to remit a pre-determined percentage of the ERC funding as its fee.

19. PMI required funding to help with cash flow issues because its services were provided in advance and its payment for those services was dependent on when, and if, the IRS provided ERC payments, as well when, and if, PMI's customers remitted PMI's consulting fees to PMI.

20. Because of the length of time that it took for the IRS to process ERC credits and ultimately issue payment to the account debtors, who in turn paid PMI, PMI was suffering from cash flow issues.

21. Because PMI was unable to obtain more traditional financing, invoice factoring was a logical solution.

22. By February 2023 Culain issued a term sheet to PMI proposing to provide invoice factoring services.

23. Although PMI would lead the Court to believe that it was presented with a "take it or leave it" proposal, in fact, PMI's principals were sophisticated enough to negotiate the terms extensively and through six different iterations of the term sheet, with PMI successfully negotiating several favorable considerations during the course of negotiations.

24. A true and correct version of the term sheet, executed by PMI on March 2, 2023 showing the edits and changes that PMI was able to negotiate is attached as Exhibit 2.

25. The parties continued discussions through March of 2023 and into April 2023, and continued to negotiate the terms of what eventually became the invoice factoring agreement.

26. Among the significant favorable terms that PMI was able to negotiate include:

a) An increase in the dollar amount of purchased invoices to $10 Million Dollars.

b) The right to request an increase to the dollar amount of purchased receivables from $10 Million to $20 Million, and the ability to cancel the contract if Culain denied that request.

c) The elimination of certain late payment fees.

d) The ability to pick and choose which invoices it offered for purchase, as opposed to most factoring agreements which require the client to offer all of its invoices for purchase.

27. On April 10, 2023, the parties executed (by Docusign) the invoice factoring agreement (the "Agreement") that governs the relationship between Culain and PMI. A true and correct copy of the Agreement is attached as Exhibit 3.

28. The Agreement specifically recognizes that it was "the result of negotiations between the parties" and that no presumption would arise against either party as the drafting party. Exhibit 3, Section 11.10.

29. PMI signed the Agreement by its "CEO, Mike Anthony".

30. During its due diligence process before signing the Agreement, Culain was provided with a copy of the California driver's license for Maged Kerolos, who had been identified as PMI's CEO. A copy of the driver's license is attached as Exhibit 4.

31. After questioning the discrepancy, Culain was told that "Mike Anthony" is a pseudonym that PMI's CEO uses in his business dealings.

32. The remaining transactional documents referred to PMI's CEO as "Maged Kerolos, (a/k/a Mike Anthony)".

33. The Agreement provides for the purchase of PMI's invoices at a discount with fees to be earned depending on how long the invoice remains open.

34. The Agreement makes it clear that Culain bears "all risks on non-payment with respect to a Purchased Receivable, in whole or in part, if such non-payment is solely the result of an Insolvency Claim with respect to the Customer from whom such Purchased Receivable is owed and such Insolvency Claim occurs prior to the earlier of (a) the date such Purchased Receivable becomes an Ineligible Receivable or otherwise becomes subject to repurchase, replacement or any other right or remedy of Buyer described in Section 5.1, or (b) the occurrence of an Event of Default". Exhibit 3, Section 5.2.

35. Because Culain is required to make an advance payment against open invoices, Article 7 of the Agreement grants Culain a first priority security interest in all of its "Accounts and Receivables (whether or not sold to [Culain]" as well as additional collateral as security for the repayment of all PMI

obligations, including PMI's obligation to "repurchase" accounts as discussed below. See, Exhibit 3, Section 7.1; Item 4 of the Schedule of Additional Terms.

36. On March 9, 2023 Culain perfected its security interest by filing the UCC-1 attached as Exhibit 5.

**CULAIN PURCHASES INVOICES PURSUANT TO INVOICE FACTORING AGREEMENT**

37. Culain began purchasing PMI invoices in May, 2023.

38. PMI is required to include Culain's banking information on all of its invoices whether factored or not.

39. Pursuant to the Agreement, Culain provided PMI with sixty-five percent (65%) of the face amount of those invoices (the "Initial Advance") that it elected to purchase.

40. When an account debtor paid a purchased invoice, Culain would return additional funds to PMI (the "Residual Payment") retaining the agreed factoring fees that had accrued between the date of purchase and the date that an invoice was fully paid.

41. Beginning in May 2023, through approximately March 2024, Culain paid PMI a total of $8.37 Million as Initial Payments and purchased invoices with a face value of approximately $13.6 Million.

42. In addition to the Initial Payments of $8.37 Million, Culain returned an additional $6.29 Million to PMI in the form of "Residual Payments", remittances from partial payments on Purchased Receivables, and collections on non-factored invoices.

43. However, by the end of January 2024, as a result of perceived fraudulent submissions by ERC consultants, the IRS suspended new ERC applications, and Culain stopped purchasing PMI invoices in late March, 2024.

44. Without a pipeline of new ERC submissions, and the cash infusion from selling those new invoices to sell to Culain, PMI was doomed.

45. By August, 2024, PMI owed Culain more than $8.5 Million and had no new invoices eligible for purchase.

46. The amounts owed by PMI were originally tracked in Culain's portfolio management software, known as "FactorSoft".

47. According to the Agreement, PMI was only entitled to receive a Residual Payment when a Purchased Invoice was paid in full.

48. As a result of an error in setting up the PMI's FactorSoft account, Culain was mistakenly releasing proceeds of payments to PMI when an account debtor made a partial payment.

49. Culain became aware of this mistake in approximately July 2024 and conducted a more comprehensive investigation of PMI's FactorSoft account.

50. During its investigation of the FactorSoft issue, Culain discovered that PMI had been charged certain late fees that PMI had been successful in negotiated out of the Agreement.

51. Beginning in August 2024, Culain began the preparation of a spreadsheet that removed late fees, and recalculating amounts due from PMI; while still permitting PMI to receive proceeds following its collection of a partial payment against a Purchased Invoice.

52. By August 2024, when PMI no longer had eligible ERC invoices to sell, and collections were slowing, it had become apparent to Culain that PMI was essentially insolvent.

53. Allowing PMI to receive proceeds from partial payments, although not contractually required, was Culain's way of allowing PMI a "lifeline".

54. The lifeline that Culain was extending was nothing more than accommodation and was certainly not intended to reform or amend the Agreement, which, of course, could only be changed in a writing signed by all parties.

55. In any event, the spreadsheet took several weeks to complete, and once it was completed Culain had its calculations independently verified by a third-party public accounting firm.

56. Culain has been fully transparent with PMI.

**PMI BREACHED THE AGREEMENT AND HAS BEEN IN DEFAULT SINCE AT LEAST OCTOBER 2024**

57. PMI complains that it has been wronged (it has not) while ignoring its own default[1] under the terms of the Agreement.

58. The Agreement, at Section 5.1, requires PMI to repurchase any receivable that becomes a "Disputed Receivable" or otherwise becomes an "Ineligible Receivable".

59. A receivable becomes a Disputed Receivable, and therefore subject to repurchase, not only when an actual dispute arises with respect to the receivable, but also when the receivable remains unpaid, in whole or in part, beyond anywhere from 150 to 400 days after the date of the invoice as provided by the Agreement. (See Exhibit 4, Section 5.1(a), the definition of "Disputed Receivable" contained in the Definitions Schedule, the definition of "Presumed Dispute Date" contained in the Definitions Schedule, and the grid contained in the third bullet point of Item 3 of the Schedule of Additional Terms.)

60. When PMI complains about the cost that it has incurred to factor its invoices, it is critical to remember that (1) the fees were negotiated at arm's length in the Agreement and (2) the amount of the fees correlates directly to the length of time that the Purchased Invoices have remained open.

[1] PMI argues that Culain never provided "Notice of Default" while ignoring that the Agreement (at Section 9.3) waives any such requirement. Not surprisingly, PMI's papers fail to identify any such requirement in the Agreement, and fails to note that it was provided with a written reminder of its default on December 22, 2024, see, Sardinia Declaration, Para. 7.

61. PMI's Invoices remained open much longer than PMI represented to Culain during the discussions and negotiations prior to execution of the Agreement.

62. The contractual term that requires PMI to repurchase invoices once they age out and become "Ineligible", benefits both parties because Culain is able to close out older invoices and PMI is able to avoid factoring fees that continue to grow.

63. When PMI was reminded in October or November of 2024 that its Agreement with Culain required the company to repurchase these invoices, its CEO and CFO admitted that PMI lacked the necessary funds to meet its contractual obligations.

64. The fees that PMI complains about (and that it mischaracterizes as "interest") could have been avoided had PMI simply honored the Agreement and "repurchased" invoices that had become ineligible due to aging.

65. After breaching the Agreement by failing to repurchase accounts, PMI compounded its breach by refusing to provide Culain with access to its banking information, leading Culain to believe that PMI is interfering with Culain's collateral .

66. PMI is contractually obligated to provide Culain "with all passwords and other information for all of its Deposit Accounts and other accounts in order to enable [Culain] to have online, view-only access to such accounts, and [PMI] will not change any such password or directly or indirectly interfere with [Culain's] view-only access to any such account during the Term of this Agreement. Exhibit 3, Section 8.4.

67. Banking information is critical for a number of reasons, not the least of which is to allow Culain to verify that PMI is not misdirecting payment of collateralized funds in violation of Sections 6.1(a), 6.2, 6.4(c), 7.1 and Item 4 of the Schedule of Additional Terms of the Agreement.

68. As a courtesy, and again, without waiving any contractual right to insist on log-in credentials to view PMI's bank accounts, Culain allowed PMI to provide copies of its bank statements as an alternative means to satisfy this requirement.

69. On or about January 14, 2026, PMI stopped providing bank statements altogether and has refused to provide log-in credentials to allow Culain to see any bank records since that time.

70. The most logical explanation for PMI's refusal to provide banking information is that PMI has been inducing the misdirection of payments by wrongfully requesting its account debtors to ignore the assignment of Purchased Invoices to Culain, as well as to disregard Culain's lien pursuant to PMI's pledge of all accounts (whether purchased or not).

71. Culain suspects that a review of PMI's banking records will substantiate that PMI is interfering with Culain's collateral.

72. Culain's suspicions with respect to misdirected payments is heightened by the dramatically decreasing collections with respect to PMI receivables.

73. The Declaration of Joseph Heim details how the collection of PMI's receivables have slowed to the point of being non-existent.

74. As a consequence of PMI's default, Culain exercised its unequivocal contractual right to:

> set-off or apply (A) the Reserve Account and any and all proceeds of Receivables and other Collateral then in Buyer's possession, and/or (B) any indebtedness or other liability or obligation at any time owing by Buyer to or for the credit or the account of Seller, to Buyer's obligation to repurchase Purchased Receivables and to Seller's payment of the Obligations then owing by Seller to Buyer hereunder, and (v) to withhold any further payments to Seller until Seller has paid to Buyer all amounts due with respect to Purchased Receivables required to be repurchased by Seller and all Obligations have been to paid in cash to Buyer in full. See, Exhibit 3, Article 9.2.

**PMI'S "USURY" ARGUMENT HAS NO MERIT**

75. PMI's argument that its Agreement with Culain is usurious displays a fundamental misunderstanding of invoice factoring.

76. The purchase of invoices at an agreed discount does not, in any manner, constitute a loan or forbearance.

77. Invoice factoring is an acceleration of earned revenue by through the purchase of an existing invoice (unlike a merchant cash advance which is the purchase of an income stream not yet generated).

78. PMI calls out two references in the thirty-page Agreement where Culain mistakenly refers to itself as the "Lender" rather than the four hundred sixty-two references where Culain identifies itself as the "Buyer".

79. Those references to the "Lender" are the result of my mistake having "copied and pasted" portions of the Agreement from a loan agreement.

80. The two references are merely "scrivener's errors" and should be treated as such.

81. Meanwhile, PMI's papers fail to note that the Agreement includes a "savings clause" that makes it clear that "the relationship of Buyer and Seller shall be that of a purchaser and seller of Receivables and Accounts, and not that of a lender and borrower". Exhibit 4, Article 7.3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Buffalo, New York
March 27, 2026

TERRENCE GREINER

\21855.0002\1315077